[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 17, 2001
THOMAS K. KAHN
CLERK

_____

Nos. 00-11309
and 00-12842

_____

D. C. Docket No. 95-03237-CV-C-S

UNITED STATES STEEL, LLC,
HEATHERWOOD GOLF CLUB, INC.,

Plaintiffs-Appellants-Counterclaim Defendants,

versus

TIECO, INC.,
ATOZ MANAGEMENT, INC.,
FLETCHER YIELDING,

Defendants-Appellees-Counterclaim Plaintiffs.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

**(August 17, 2001)**

Before BLACK, RONEY and COX, Circuit Judges.

BLACK, Circuit Judge:

Appellants, the plaintiffs and counterclaim defendants, are United States Steel, LLC (USX)[1] and its subsidiary the Heatherwood Golf Club (Heatherwood). Appellees, the defendants and counterclaim plaintiffs, are Fletcher Yielding and two of his corporate entities, TIECO, Inc. (TIECO) and ATOZ Management, Inc. (ATOZ). TIECO is a vendor of golf course maintenance equipment, light industrial equipment, and irrigation equipment. ATOZ is the management arm of TIECO. USX operates a tractor shop, and Heatherwood operates a golf course. Prior to this litigation, USX's tractor shop and Heatherwood's golf course were customers of TIECO.

Appellants sued Appellees alleging liability under the federal RICO statutes and state law. Appellees filed several counterclaims, alleging violations of 42 U.S.C. § 1983 and state law. The district court granted Appellee Yielding summary judgment on all of Appellants' claims. The case proceeded to a jury trial. Before submitting the case to the jury, the district court granted Appellees TIECO and ATOZ judgment as matter of law on Appellant Heatherwood's claims. During jury deliberations, the district court dismissed Appellant USX's claims as a sanction for discovery violations. The jury rendered a verdict in favor of Appellees on the counterclaims, awarding $6.8 million to TIECO and $375,000 to Mr. Yielding, and

---

[1] At the time of trial, United States Steel LLC was constituted as the USX Corporation.

2

the district court entered judgment accordingly. Subsequently, regarding Appellees' counterclaims, the district court denied Appellants' renewed motion for judgment as matter of law and motion for remittitur. With respect to Appellants' claims, the court denied Appellants' motion for a new trial and to vacate judgment of dismissal. Lastly, the district court awarded attorney's fees and costs to Appellees in the total amount of $1,442,769.27.

Appellants contend the following rulings from the district court were erroneous: (1) the grant of judgment as a matter of law to TIECO and ATOZ on Heatherwood's claims and the denial of Appellants' motion for a new trial on Heatherwood's claims, (2) the dismissal of USX's claims as a discovery sanction and the denial of Appellants' motion for a new trial on USX's claims, (3) the judgment awarding $6.8 million to TIECO and $375,000 to Mr. Yielding, (4) the denial of Appellants' renewed motion for judgment as matter of law on Appellees' counterclaims or, in the alternative, the denial of Appellants' motion for remittitur, and (5) the judgment awarding $1,442,769.27 in attorney's fees and costs to Appellees.[2]

---

[2] Appellants raise the first four alleged errors in appeal number 00-11309. Appellants raise the fifth alleged error in appeal number 00-12842. The two appeals have been consolidated.

The first two errors claimed by Appellants do not warrant discussion, and we affirm without opinion pursuant to 11th Cir. R. 36-1.[3]  In Part I of this opinion, we address the third and fourth errors claimed by Appellants, both of which concern Appellees' counterclaims.  In Part II, we address the fifth alleged error, concerning the award of attorney's fees and costs.

## I.  APPELLEES' COUNTERCLAIMS

Appellees' counterclaims rest on USX's cooperation with the Alabama Attorney General's Office (AG)[4] during a criminal investigation and prosecution of Appellees.  According to Appellees, the manner in which USX cooperated with the AG violated federal and Alabama law.  The jury agreed.  It found USX liable, under federal law, for a violation of 42 U.S.C. § 1983, and, under Alabama law, for the torts of malicious prosecution, abuse of process, interference with business relationships, civil conspiracy, and defamation.  Except for the defamation tort, TIECO was the sole counterclaimant.  Both TIECO and Mr. Yielding won damages under the defamation counterclaim.  Appellants contend USX was

---

[3]  An affirmance pursuant to Rule 36-1 has no precedential value.  *See Va. Props., Inc. v. Home Ins. Co.*, 74 F.3d 1131, 1132 n.2 (11th Cir. 1996).

[4]  When referring to the "AG," we are alluding to officials who acted collectively on behalf of the Alabama Attorney General's Office.  We are not referring to the particular person who held the office of Attorney General.

4

entitled to judgment as matter of law on Appellees' counterclaims. In addition, Appellants challenge the judgment on the ground the district court made numerous errors at trial.

In subpart A, we set forth the admissible evidence in the record in the light most favorable to Appellees. Our review of the evidence, however, does not include any evidence derived from a state judicial opinion which was erroneously entered into evidence. In subpart B, we explain why the district court's admission of the state judicial opinion constituted reversible error. In subpart C, we examine, as to each of Appellees' counterclaims, whether USX was entitled to judgment as a matter of law.

A.    Background

    1.  Initial Stages

The genesis of the USX-AG cooperation was a disclosure by a former TIECO employee, Marty Colby. By May 1995, Mr. Colby had communicated to his attorney, Victor Hayslip,[5] that TIECO's accounting practices with respect to USX were questionable. Essentially, Mr. Colby alleged that TIECO used bogus invoices and disloyal USX employees to bill USX for materials purchased but

---

[5] Mr. Hayslip had represented Mr. Colby and Turfcare Products (TIECO's main competitor) in an unrelated lawsuit brought by TIECO over a non-compete agreement.

never received. Mr. Colby admitted misappropriating goods himself. Ironically, Mr. Hayslip was an attorney with a firm, Burr & Foreman, which had been serving as USX's outside counsel for many years. Mr. Hayslip informed the AG and USX about Mr. Colby's allegations and arranged a meeting in his office on June 13, 1995.

Prior to the June 13th meeting, the AG and USX discussed Mr. Colby's allegations. At the meeting, the AG and USX interviewed Mr. Colby separately. Mr. Colby repeated his allegations about TIECO's accounting practices. USX's assistant general counsel questioned Mr. Colby's credibility. Nonetheless, both USX and the AG effectively acceded to Mr. Colby's request (made by Mr. Hayslip) that they not pursue any criminal or civil remedies against him.

Although the AG and USX interviewed Mr. Colby separately, they jointly conferred at the June 13th meeting. When USX signaled its intention to conduct an internal audit, the AG requested that USX abstain from any actions which would alert TIECO. Accordingly, USX agreed not to interview any suspected USX employees or pursue any remedy against TIECO.

On June 27, 1995, the AG sent a letter to USX requesting any information possessed by USX about vendors, other than TIECO, who similarly defrauded USX. USX provided the requested information and indicated it was "very

interested" in cooperating with the AG's investigation of TIECO and other vendors. Additionally, USX interviewed former TIECO employees, and, on July 18, 1995, forwarded summaries of the interviews to the AG. Lastly, in the summer of 1995, Mr. Hayslip called the AG on behalf of USX, inquiring repeatedly about the status of the investigation.

### 2. The AG's Seizure of TIECO's Records

On August 30, 1995, the AG applied in state court for a warrant to seize specific documents and materials from TIECO's place of business. The affidavit accompanying the warrant was signed and prepared by the AG's chief investigator, and it was reviewed by one of the AG's criminal prosecutors. According to the chief investigator, the information in the affidavit was gained from interviews conducted by the AG of Mr. Colby and four other former TIECO employees. Finding probable cause, the state court issued the warrant. On August 31, 1995, led by the chief investigator, the AG seized numerous TIECO documents and computer tapes.

No USX official was present during either the issuance or execution of the warrant. Moreover, the chief investigator, as well as USX, denied that USX was involved in, or even had knowledge of, the AG's efforts to procure the search

7

warrant.  No evidence in the record rebuts this denial by the chief investigator,

indicates he had a motive to lie, or in any way impeaches his credibility.

3. USX's Cooperation with the AG after the Seizure of TIECO's Records

By the time of the seizure, the AG realized it did not have the expertise or the resources to fully investigate the seized records and to pursue a criminal prosecution of TIECO. Accordingly, after the seizure, the AG requested auditors from victim companies, including USX. In particular, the auditors were asked to compare their own company's records with those seized from TIECO. The AG planned, with USX's cooperation, to have the auditors serve as expert witnesses in any criminal proceeding.

On three separate occasions (October 11-12, 1995, November 7-9, 1995, and January 31- February 1, 1996), USX auditors visited the AG's office to review the seized TIECO records. One of these reviews occurred after USX had filed the instant lawsuit. The auditors examined all documents related to any USX-TIECO transaction. The AG did not permit the auditors to photocopy or remove the records. Instead, the auditors took copious notes, entered data on USX computers, and created spreadsheets from the data. USX kept the AG apprized of the information gained from the audit.

Two of TIECO's suppliers were also present during portions of these reviews. At times, USX auditors reviewed documents with TIECO's suppliers.

On at least one occasion, a USX auditor provided an invoice to one of TIECO's suppliers.

In addition to examining records, USX auditors assisted the AG in deciphering computer tapes seized from TIECO. Duplicate tapes were sent for reformatting to a California company, which returned the tapes directly to USX along with software to read the tapes. Although the AG paid the California company for this service, it intended to seek reimbursement from USX and the other victim companies. Moreover, because the AG did not have a computer capable of reading the tapes, USX auditors analyzed the tapes on their own computer. USX and the AG exchanged results of these analyses and other information gleaned from the tapes. Once the analyses were complete, USX maintained some of the data, both on its own computers and in computer printouts.

The cooperation between USX and the AG extended to other areas. For instance, six days after the AG's seizure of TIECO's records, USX transmitted to the AG printouts of accounts payable information concerning USX-TIECO transactions; in the letter accompanying the printouts, USX stated, "[I]f we have additional ideas on how you might approach the TIECO documents now in your possession, we will be in touch." In October 1995, the AG provided USX information from its interview with a representative of a TIECO supplier. In

November 1995, USX mailed to the AG photographs of property owned by a USX employee suspected of wrongdoing. In December 1995, the AG faxed to USX inventories of the seized records and copies of some seized records. In mid-December 1995, Mr. Hayslip, acting on USX's behalf, sent the AG a summary of TIECO's accounts receivable, invoices, pick tickets, and other documents relating to TIECO-USX and TIECO-Heatherwood transactions.

The highest level of the AG-USX cooperation occurred with the interviews of USX employees from the tractor shop and golf course. In November 1995, to prepare for the interviews, USX auditors drafted a lengthy memorandum to inform the AG about the allegations USX had unearthed. The memorandum detailed specifically how each USX employee had participated in the alleged scheme and provided personal information about each employee. Separately, USX provided to the AG social security numbers of the suspected employees. USX's assistant general counsel circulated a memorandum, dated December 19, 1995, which set forth the ground rules for interviewing USX employees. The memorandum called for each employee, without prior warning, to be interviewed twice—once by a team from the AG and FBI and again by a team from USX. On December 20, 1995, the AG, USX, and FBI met to prepare for the employee interviews; over the next two days, they conducted interviews of nearly every employee in accordance

11

with the December 19th memorandum. USX threatened disciplinary action and criminal prosecutions unless the employees cooperated in the investigation.

4. Appellants' Lawsuit

Shortly before the employee interviews, Mr. Hayslip filed the instant lawsuit on December 15, 1995, on behalf of Appellants. Before filing the suit, USX had sent Mr. Hayslip information gained from its review of TIECO's seized records. Also prior to the lawsuit, Appellants made a settlement demand, giving Appellees just three days to respond. Among other things, Appellants demanded cooperation in the AG's and USX's parallel investigations and a payment of $555,977.52. That dollar figure was derived from information in TIECO's seized records.[6]

During the first half of 1996, the cooperation between the AG and USX mostly involved legal matters and proceedings. For example, the AG and USX conferred after the district court in this case ordered Appellants to produce "a copy of all of [TIECO's] data, computer tapes, and documents in its possession which were seized by the [AG]." In March 1996, USX's counsel, Burr & Foreman, shared legal research with the AG.

5. Mr. Yielding's Ethics Complaint Against the AG

---

[6] Appellants argue that evidence of the settlement demand should not have been admitted pursuant to Fed. R. Evid. 408. We need not address this argument to resolve this case.

In May 1996, attention shifted from the investigation of TIECO to an ethics complaint filed by Mr. Yielding, on behalf of himself, TIECO, and ATOZ. The complaint, filed with the Alabama State Ethics Commission (Commission), alleged the AG seized TIECO's property and then shared, with USX and Burr & Foreman, information gained from that seizure. Mr. Yielding stated he never authorized such a disclosure.

At the Commission's proceedings, appearances were made by USX's assistant general counsel, Mr. Hayslip, and James Wager, who was USX's lead auditor. The presentation given to the Commission by Mr. Wager was crucial to the AG's defense: he asserted it was probable TIECO was bribing local USX managers. However, although USX was aware that Mr. Colby had stolen some items from TIECO, Mr. Wager did not mention this fact. On July 10, 1996, the Commission concluded there were insufficient facts to find the AG had violated Alabama ethics laws. In a letter to USX, the AG expressed gratitude for USX's assistance, stating it went "beyond the call of duty."

6. Mr. Hayslip's Statement to the Press

During the pendency of the ethics complaint, Mr. Hayslip made some derogatory comments related to the ethics complaint. One newspaper reported the following:

13

Victor Hayslip . . . said Tieco's complaints ring hollow. "What they're doing is the equivalent of Jeffrey Dahmer complaining his victims got blood on the carpet," Hayslip said. "It's without merit.". . . Hayslip said the complaints were an attempt to embarrass [the Alabama Attorney General] for political reasons.

Similar comments were printed in multiple Alabama newspapers.

### 7. Grand Jury Indictments

Another event that occurred during the pendency of the ethics complaint was a state grand jury investigation led by the AG. In June 1996, the grand jury returned seven indictments containing 125 counts alleging wrongdoing by TIECO. Twenty-one counts pertained to USX-TIECO transactions.

In his testimony before the grand jury, Mr. Hayslip misrepresented the extent of Mr. Colby's personal involvement in the scheme.[7] At the trial in this case, USX's assistant general counsel acknowledged that he was aware of Mr. Hayslip's misrepresentations. Nonetheless, USX never informed the AG, the grand jury, or the state court about the misleading aspects of Mr. Hayslip's testimony.

---

[7] To reiterate, we are not finding that Mr. Hayslip made misrepresentations before the grand jury. We are merely portraying the facts in the light most favorable to Appellees. Mr. Hayslip and Burr & Foreman are not parties to this appeal, and they have not been heard on this allegation.

Besides Mr. Hayslip, the other USX representative to provide significant grand jury testimony was Mr. Wager, the lead auditor. Mr. Wager accused TIECO of billing USX for items it had never received. By the time of the grand jury proceeding, however, USX's audit team had failed to search the golf course or the tractor shop.[8] Just as he had done before the Commission, Mr. Wager failed to inform the grand jury that Mr. Colby, in participating in the alleged scheme, had stolen some items from TIECO.

The core of Mr. Wager's testimony was an explanation of TIECO's accounting system and how TIECO was billing USX for items never delivered to USX. According to Mr. Wager, TIECO would create an invoice for a certain item. The invoice would show the item was shipped to USX's tractor shop in Alabama. To bill USX, the invoice would be sent to USX's headquarters in Pittsburgh, Pennsylvania. Initially, TIECO's inventory would be debited to reflect the loss of the item. In Mr. Wager's view, all of the foregoing practices were acceptable, but the insidious aspect of TIECO's system was a so-called "adjustment account."

---

[8] Appellees assert that, subsequent to the indictments, USX found several of the alleged missing items at the tractor shop. However, the record citations provided by Appellees do not support this assertion. One citation is the cross-examination of Mr. Wager, but Mr. Wager stated he had no knowledge about the subsequent search. The other citation is to a state judicial opinion, which was not admissible for reasons discussed below. *See infra* Part I.B. Regardless, even if Appellees' assertion is true, it would not alter our legal analysis.

Under this account, TIECO would credit its inventory for an item which, according to the invoice, already had been shipped to the tractor shop and for which USX had been billed. Put simply, from TIECO's accounting records, it appeared TIECO was billing USX Pittsburgh for items which were never delivered to USX.

TIECO's explanation of its accounting system conformed, to a large extent, with the explanation given by Mr. Wager. At trial, Appellees called Pam Hackbarth, a TIECO employee who knew more than anyone about TIECO's accounting system and the adjustment account. She testified as follows:

> [T]he branch secretary [for TIECO] generate[s] an invoice, and the invoice is mailed to USX in Pittsburgh for payment. USX pays. And TIECO shows the invoice paid, and credits the [a]djustment [a]ccount, and credits the account with the payment.
> . . . .
> [W]hen we would bill [USX], that would be relieving our inventory of that item. And we would put a credit into the [a]djustment [a]ccount, bringing it back into inventory so it would be available.

Ms. Hackbarth admitted the adjustment account was used when TIECO was invoicing a customer for items not delivered. She further conceded that USX in Pittsburgh was not informed about the adjustment account.

Contrary to Mr. Wager's suggestion, however, the purpose of the adjustment account was not to commit fraud on USX. Rather, Ms. Hackbarth explained:

> [T]he customer would want one product, and maybe because of budget reasons could not buy that product. And so [TIECO] would bill for parts. . . . Then [TIECO] would create the account for those

16

> parts, and that would create a credit balance. And then [the customer] . . . would build a credit, and then he could buy what he needed. And it was to be items that the customer used in doing his job or taking care of the facility . . . .

By referring to "customer," Ms. Hackbarth was not referring to USX's headquarters in Pittsburgh, but rather to USX employees in Alabama at the tractor shop and the golf course. These Alabama employees would use TIECO's adjustment account as a means to procure items they could not otherwise obtain through the normal USX budgetary process. This fact became evident, not only from Ms. Hackbarth's testimony, but also from the testimony of former USX and TIECO employees.[9] In any event, the Alabama employees were procuring items for use at USX's facilities, not for personal use.

The grand jury indictments against TIECO went nowhere. In April 1997, the AG voluntarily dismissed all counts related to USX. In July 1997, Judge James S. Garrett of the Circuit Court of Jefferson County dismissed the remaining counts for prosecutorial misconduct.

As part of his opinion dismissing the indictments, Judge Garrett incorporated a statement of facts prepared by TIECO in connection with its motion to dismiss

---

[9] The employees worked for USX's subsidiary, Heatherwood, but their testimony was that all budgetary decisions were made by the parent corporation, USX.

17

the indictment. Not surprisingly, the statement of facts is quite favorable to Appellees and relied upon heavily by Appellees in their brief to this Court. As we discuss immediately below, the admission of Judge Garrett's opinion was improper, *see infra* Part I.B, and we do not consider the evidence contained therein.

Admissibility of State Judicial Opinion

    1.  Background

The AG and TIECO were parties in the state criminal proceeding before Judge Garrett. Burr & Foreman represented USX in the proceeding, but USX was not a party. In dismissing the indictments, Judge Garrett issued an opinion which adopted *in toto* a memorandum of facts prepared by TIECO in connection with its motion to dismiss the indictment.

Over Appellants' objection, the district court admitted the opinion, including the memorandum of facts. The memorandum was an exhaustive account that neatly conformed to Appellees' allegations, especially with respect to the malicious prosecution, abuse of process, and civil conspiracy counterclaims. As is set forth in the margin, the memorandum depicted in great detail Appellees' view

about the nature of USX's involvement in the AG's investigation of TIECO.[10]

Furthermore, Judge Garrett did not mince words, as he found, "[T]he misconduct of the [AG] in this case far surpasses in both extensiveness and measure the totality of any prosecutorial misconduct ever previously presented to or witnessed by this Court."

Judge Garrett's opinion was a significant portion of Appellees' case (as well as their brief on appeal). During the examination of witnesses, Appellees' counsel repeatedly referred to the proceedings before Judge Garrett, and on at least one occasion, counsel read verbatim an extensive portion of the opinion. In closing argument, Appellees' counsel told the jurors if they had any question about the credibility of Appellants' witnesses, they should read Judge Garrett's opinion.

---

[10] The memorandum of fact described, *inter alia*: (1) cooperation between the AG and USX in reviewing TIECO's seized documents, (2) a meeting on November 8, 1995, where USX informed the AG that it intended to sue TIECO and would be providing the AG with copies of charts; (3) the coordination between the AG and USX in having TIECO's computer tapes reformatted and read; (4) USX's agreement to repay the AG for reformatting the tapes; (5) an implication that either USX's lead auditor, Mr. Wager, or the AG's investigator, John Mulligan, had lied about the repayment agreement; (6) legal advice given to the AG and USX that "USX should not be used as quasi government agency"; (7) cooperation between the AG and USX in conducting interviews of USX's employees; and (8) the AG's sending TIECO's records to USX in preparation for the interviews.

Prior to trial, Appellants filed a motion *in limine* objecting to Judge Garrett's opinion, and they raised the objection again at trial. Appellants argued the opinion should be excluded pursuant to Fed. R. Evid. 401 and Fed. R. Evid. 403. We address solely the Rule 403 argument.

2. Fed. R. Evid. 403

Rulings on the admission of evidence are reviewed for abuse of discretion. *See, e.g., United States v. Adair*, 951 F.2d 316, 320 (11th Cir. 1992). An error on an evidentiary ruling will result in the reversal of a jury's verdict only if a party establishes a substantial prejudicial effect or a manifest injustice. *See Anderson v. WBMG-42*, 253 F.3d 561, 563 (11th Cir. 2001) (citing *Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1305 (11th Cir. 1999)).

As a preliminary matter, had Appellants lodged an objection pursuant to Fed. R. Civ. P. 801(c), the admissibility of Judge Garrett's opinion could be easily resolved. *See United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994). In *Jones*, the district court admitted factual findings made in a separate case by another district court. *See id.* at 1551. We concluded such factual findings were hearsay, and they could not be either judicially noticed or admitted under the public records exception to the hearsay rule. *See id.* at 1553-54 (citing Fed. R.

Evid. 201 and Fed. R. Evid. 803(8)(C)); *see also Nipper v. Snipes*, 7 F.3d 415, 417-18 (4th Cir. 1993).

Despite not being raised, the conclusion that Judge Garrett's opinion was inadmissible hearsay is not inconsequential to our analysis under Rule 403.[11] Rule 403 involves balancing, on the one side, the evidence's probative value and, on the other side, the evidence's dangers, including its unfairly prejudicial and misleading nature. By comparison, hearsay is disfavored because it is not subjected to the oath, the rigors of cross-examination, or the first-hand scrutiny of the jury. *See United States v. Parry*, 649 F.2d 292, 294-95 (5th Cir. 1981)[12] (citing *McCormick on Evidence* § 245 (2d ed. 1972)). As a result, hearsay can be unreliable; for instance, in the context of the Confrontation Clause,[13] hearsay that does not fall within a firmly-rooted exception is presumed unreliable. *See Idaho v. Wright*, 497

---

[11] Rule 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, and needless presentation of cumulative evidence."

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[13] Of course, the Confrontation Clause is not applicable to civil cases, but we refer to its jurisprudence to illustrate hearsay's unreliability.

U.S. 805, 818, 110 S. Ct. 3139, 3148 (1990). Due to its unreliability, hearsay can be misleading and unfairly prejudicial.

The hearsay in Judge Garrett's opinion—which does not satisfy a firmly-rooted exception[14]—was particularly unreliable and misleading. Although the statement of facts was presented to the jury as Judge Garrett's finding, it was prepared entirely by Appellees' counsel. In effect, the admission of the statement of facts permitted counsel to testify on his client's behalf, without being cross-examined. Further, the statement of facts was intended to exculpate TIECO, and thus, it was self-serving and unreliable. *Cf. United States v. Reme*, 738 F.2d 1156, 1168-69 (11th Cir. 1984).

Of course, Judge Garrett accepted the statement of facts by incorporating it into his opinion. But this made the hearsay contained therein even more unfairly prejudicial and misleading. As the Fourth Circuit has stated, "[J]udicial findings of fact present a rare case where, by virtue of their having been made by a judge, they

_____

[14] As we noted in *Jones*, the common law did not permit the admission of a judgment from another case. 29 F.3d at 1554. One court has found that judicial findings are admissible under the residual exception to the hearsay rule. *See Jones v. Wash. Metro. Area Transit Auth.*, 946 F. Supp. 1011, 1019-20 (D.D.C. 1996). But that exception is not firmly rooted. *See Wright*, 497 U.S. at 817-18, 110 S. Ct. at 3147-48.

22

would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice." *Nipper*, 7 F.3d at 418 (internal quotations omitted).

The Fourth Circuit's *Nipper* decision is particularly pertinent to the instant case. When we ruled in *Jones* that a judicial finding was inadmissible hearsay, we relied heavily on *Nipper*. *See Jones*, 29 F.3d at 1554. In *Nipper*, like here, the plaintiff introduced the factual findings of a state court to prove a civil conspiracy. *See Nipper*, 7 F.3d at 416. While reversing on the ground that the judicial findings were inadmissible hearsay, the Fourth Circuit also concluded that judicial findings, due to the danger of unfair prejudice, were inadmissible under Rule 403. *See id.* at 417-418; *see also Carter v. Burch*, 34 F.3d 257, 265 (4th Cir. 1994); *United States v. DeSantis*, 134 F.3d 760, 770 (6th Cir. 1998) (Nelson, J., concurring); *Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 324, 325 (E.D.N.Y. 2001); *Hairston v. Wash. Metro. Area Transit Auth.*, No. Civ. 93-2127 (D.D.C. April 10, 1997).

The district court abused its discretion in admitting Judge Garrett's opinion. The jury, not Judge Garrett, was charged with making factual findings on Appellees' allegations in this case. Moreover, Appellants have shown they were substantially prejudiced by the admission of Judge Garrett's opinion, as Appellees relied on the opinion throughout the trial. Most notably, during closing argument,

23

Appellees' counsel told the jury to use the opinion to make credibility determinations. Therefore, the district court's admission of the opinion constituted reversible error.

C.     Judgment as a Matter of Law

A party is entitled to judgment as a matter of law "[i]f during a trial by jury [the opposing] party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for [the opposing] party on that issue." Fed. R. Civ. P. 50(a)(1). We review de novo the denial of a Rule 50 motion and apply the same standard as the district court. *See, e.g., Bogle v. Orange County Bd. of County Comm'rs*, 162 F.3d 653, 656 (11th Cir. 1998). Furthermore, for those close claims based on state law, "we are bound to decide the [claim] the way it appears the state's highest court would." *E.g., Royal Ins. Co. of Am. v. Whitaker Contracting Corp.*, 242 F.3d 1035, 1040 (11th Cir. 2001) (internal quotations and citation omitted).

Under Rule 50, a court considers the evidence in the light most favorable to the non-movant and grants all reasonable inferences in favor of the non-movant. *See, e.g., Bogle*, 162 F.3d at 656. Nonetheless, a non-movant must present more than a mere scintilla of evidence. *See, e.g., Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000). A court should deny a motion for judgment as a matter of law

24

"only if reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." *Id.* (internal quotations omitted). With this standard, we analyze for each of Appellees' counterclaims whether USX should have been granted judgment as a matter of law.

1.  Violation of 42 U.S.C. § 1983

To violate 42 U.S.C. § 1983, a party must be acting "under color of state law." *Id.*; *e.g., Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993). Although USX is a private corporation, Appellees contend USX nonetheless violated § 1983 because it acted in concert with the AG, an arm of the state of Alabama. Even if this assertion is true, it does not, by itself, establish liability under § 1983. To state a claim under § 1983, a party must also prove a violation of a particular constitutional or federal statutory provision. *See id.*; *Whiting v. Traylor*, 85 F.3d 581, 583, 584 n.4, 586 (11th Cir. 1996). In this case, Appellees claim a violation of (1) the Due Process Clause of the Fourteenth Amendment and (2) the Fourth Amendment as applied to states through the Fourteenth Amendment.

As a preliminary matter, the district court's jury instruction on the Due Process Clause and the Fourth Amendment was inadequate. The charge merely stated the following:

25

> Under the Fourth Amendment . . . , every person . . . has the right to be free from an unreasonable search and seizure.  Under the Fourteenth Amendment . . ., no state may deny to any of its citizens "due process of law."  Notice of contemplated action and an opportunity to be heard are the two rights guaranteed by the due process clause of the Constitution.

This instruction was empty of any substance, as it does little more than restate the constitutional text.  Like all causes of action, constitutional claims have elements which the claimant must prove.  *See, e.g.,* Eleventh Circuit Pattern Jury Instructions (Civil Cases) § 2.2, at 198 (1999) (describing elements of Fourth Amendment claim).  The hollow instruction in this case, however, effectively permitted the jury to usurp the district court's role as interpreter of the Constitution.

Nevertheless, even if the jury had been properly instructed, it could not have reasonably found a constitutional violation.  In arguing the Due Process Clause was violated, Appellees point to much of the same evidence they rely on for the state law malicious prosecution claim.[15]  But TIECO has no right under the substantive component of the Due Process Clause to be free from criminal

---

[15]  While relying on the same evidence, Appellees state in their brief, "There is no assertion of a malicious prosecution claim under 42 U.S.C. § 1983." Appellees' Br. 33.  This statement highlights the perplexing nature of Appellees' § 1983 claim.  When asked at oral argument to articulate the heart of the constitutional claim, Appellees' counsel was unable to do so.

prosecution without probable clause. *See Albright v. Oliver*, 510 U.S. 266, 268, 114 S. Ct. 807, 810 (1994); *Whiting*, 85 F.3d at 584 nn.3 & 4.

Whether a malicious prosecution claim can be brought via the procedural component of the Due Process Clause is an open question in this circuit.[16]  *See Whiting*, 85 F.3d at 584 n.3 (citing *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 43 (1st Cir. 1994)).  Justice Kennedy, joined by Justice Thomas, has suggested that such a claim would lack merit where, as here, state law provides a cause of action for malicious prosecution.  *See Albright*, 510 U.S. 283-86, 114 S. Ct. at 818-19 (Kennedy, J., concurring).  We need not address this question today.  Even if we were to accept the proposition that such a cause of action existed, the plaintiff would be required, at the very least, to establish the common-law tort of malicious prosecution, including the absence of probable cause.  *See Albright*, 510 U.S. at

---

[16]  Allegations of malicious prosecution could plausibly constitute a violation of the Fourth Amendment.  For instance, we observed in *Whiting*:

> Labeling . . . a section 1983 claim as one for a "malicious prosecution" can be a shorthand way of describing a kind of legitimate section 1983 claim: the kind of claim where the plaintiff, as part of the commencement of a criminal proceeding, has been unlawfully and forcibly restrained in violation of the Fourth Amendment and injuries, due to that seizure, follow as the prosecution goes ahead.

85 F.3d at 584; *accord Uboh v. Reno*, 141 F.3d 1000, 1002-03 (11th Cir. 1998). But, in this case, TIECO, a corporation, was never arrested, detained, or seized in any way.  Thus, the Fourth Amendment violation envisioned by *Whiting* could not have occurred in this case.

270 n.4, 114 S. Ct. at 811 n.4; *see also id.* at 292, 296-97, 300-02, 114 S. Ct. at 823, 825, 827-28 (Stevens, J., dissenting) (suggesting Due Process Clause is violated whenever prosecution in not predicated on probable cause).  As discussed below, probable cause existed to prosecute TIECO, and thus Appellees have not established the common-law tort.  *See infra* Part I.C.2.  Thus, no violation of procedural due process could have occurred.[17]

Finally, we address Appellees' allegations concerning the search and seizure of TIECO's records.  Appellees must rely on the Fourth Amendment, the explicit constitutional text that protects citizens from searches and seizures.  *See Albright*, 510 U.S. at 274, 114 S. Ct. at 813.  A warrant, and its corresponding search, violates the Fourth Amendment if it fails to specify the place to be searched and the items to be seized, *see Steele v. United States*, 267 U.S. 498, 45 S. Ct. 414 (1925); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 51 S. Ct. 153 (1931); or if it is issued by an official who is not neutral and detached, *see Coolidge v. New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022 (1971), or if it is procured by a false statement made intentionally or recklessly, *see Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978); or if it is not supported by

---

[17]  Appellees also argue that TIECO's procedural due process right was violated because the AG and USX conspired to violate Alabama's ethics laws. This contention lacks merit.

probable cause, *see Massachusetts v. Upton*, 466 U.S. 727, 104 S. Ct. 2085 (1984). None of the foregoing occurred here. On the contrary, Appellees allege that USX agreed to delay its audit of TIECO "so the AG could produce probable cause for a search warrant." Appellees' Br. 4; *see also* Appellees' Am. Compl. ¶ 2.a., at 5 (stating that "[i]n an effort to help the [AG] establish enough probable cause to obtain a search warrant, USX began supplying the [AG] with information"). Assuming that Appellees' allegation is true, an agreement to delay a search until there *is* probable cause could not possibly run afoul of the Fourth Amendment. *See* U.S. Const. amend. IV (stating that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation").

In sum, there is no evidence in the record to support a finding that Appellees' federal constitutional rights were violated. The district court should have granted USX judgment as a matter of law on the § 1983 counterclaim.

2. Malicious Prosecution

Under Alabama law, to prevail on a malicious prosecution claim, a plaintiff (in this case, TIECO) must show: (1) a prior judicial proceeding was instituted by the defendant (in this case, USX); (2) the defendant acted without probable cause in the prior proceeding; (3) the defendant acted with malice in instituting the prior proceeding; (4) the prior proceeding ended in favor of the plaintiff; and (5) the

plaintiff was damaged. *See Poff v. Hayes*, 763 So. 2d 234, 240 (Ala. 2000); *S.S. Kresge Co. v. Ruby*, 348 So. 2d 484, 487-88 (Ala. 1977). Appellants contend Appellees failed to establish the first, second, and third elements. We address solely the second element, probable cause.[18]

Probable cause is "a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged." *Simpson v. Life Ins. Co. of Ga.*, 614 So. 2d 994, 996 (Ala. 1993) (internal quotations omitted); *accord Eidson v. Olin Corp.*, 527 So. 2d 1283, 1285 (Ala. 1988); *see also Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 832 (Ala. 1999); *S.S. Kresge* 348 So. 2d at 488. In determining whether probable cause existed, the facts should not be viewed in hindsight, but rather at the time the prosecution is instituted. *See Nat'l Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133, 139 (Ala. 1984). Where material facts are disputed, the issue of probable cause is for the jury; however, where the

---

[18] Grand jury indictments are prima facie evidence of probable cause under Alabama law. *See, e.g., Simpson v. Life Ins. Co. of Ga.*, 614 So. 2d 994, 996 (Ala. 1993). This prima facie evidence is rebutted if the indictments were "induced by fraud, subornation, suppression of testimony, or other like misconduct of the party seeking the indictment." *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133, 140 (Ala. 1983). Because we conclude probable cause was established as a matter of law even in the absence of an indictment, we need not decide whether the grand jury indictments in this case were rebutted.

material facts are not disputed, the issue is one of law for the court. *See S.S. Kresge*, 348 So. 2d at 488. Put another way, if there are undisputed facts in the record establishing that the defendant had probable cause to pursue the criminal indictments, the plaintiff cannot recover for malicious prosecution. *See Eidson*, 527 So. 2d at 1285.

In this case, undisputed facts establish that, at the time of the grand jury's investigation, USX reasonably suspected TIECO of criminal activity. As mentioned previously, TIECO's description of its accounting system essentially comported with the description given by USX to the grand jury. Mr. Wager, USX's lead auditor, told the grand jury that TIECO billed USX in Pittsburgh for items not delivered to USX's tractor shop or golf course. Similarly, Ms. Hackbarth, TIECO's employee in charge of accounting, testified at trial that TIECO was billing USX in Pittsburgh for one item while delivering a different item to the tractor shop and golf course. In other words, the item being billed was not being delivered. Although TIECO may have had an innocent explanation for this accounting system, the system, on its face, gave USX a reasonable ground for suspecting TIECO of fraud. Furthermore, even though USX may have had reason to question the credibility of TIECO's principal accuser (Mr. Colby), that did not denigrate the probable cause created by TIECO's accounting system. Therefore,

31

the district court should have granted USX judgment as a matter of law on the malicious prosecution counterclaim.

3.  Abuse of Process

To state an abuse of process claim, one must allege the abuse of a judicial process.  *See* W. Page Keeton, *Prosser and Keeton on Torts* § 121, at 898 (5th ed. 1984) (cited in *Drill Parts and Serv. Co. v. Joy Mfg. Co.*, 619 So. 2d 1280, 1288 (Ala. 1993)).  In this case, Appellees allege USX abused the process of a criminal search warrant.  However, based on the Supreme Court of Alabama's decision in *Drill Parts*, Appellees have failed to establish an abuse of process claim.  619 So. 2d at 1286-89.

The plaintiffs in *Drill Parts*, like Appellees here, alleged that the defendants had used a criminal search warrant to gather information for a civil suit against the plaintiffs.  *See id.* at 1282, 1286.  Noting that malice was an element of an abuse of process claim,[19] the Supreme Court of Alabama held, "[T]o establish malice in this case[,] the plaintiffs must show that the defendants *willfully caused* a criminal search warrant to issue for the wrongful purpose of obtaining discovery for a civil action against the plaintiffs."  *Id.* at 1289 (emphasis added); *accord* Keeton, *supra*,

---

[19]  The other elements for an abuse of process claim under Alabama law are ulterior purpose and wrongful use of process.  *See, e.g., Caldwell v. City of Tallassee*, 679 So. 2d 1125, 1127 (Ala. 1996).

§ 121, at 898 (stating an essential element is "a wilful act in the use of the process not proper in the regular conduct of the proceeding"). In the instant case, the evidence is insufficient to show that USX "willfully caused" the search warrant for TIECO's premises.

Granted, USX was cooperating with the AG both before and after the issuance of the search warrant, and USX used information from the seized records to prepare its settlement demand. To reiterate, however, the challenged process must be a judicial one, that is the search warrant—not the AG's investigation.[20] Nothing in the record indicates that USX controlled or influenced, or even participated in, the decision to seek and execute the warrant. No USX representative was present for either the procurement or execution of the warrant. Further, according to the AG's chief investigator (who sought and executed the warrant), all the information in the affidavit accompanying the warrant application was gained from the AG's own interviews of former TIECO employees. Most importantly, the chief investigator unequivocally denied that USX was involved in,

---

[20] That does not mean evidence of USX's conduct after the warrant issued and during the AG's investigation was irrelevant. Such evidence was pertinent to establishing an ulterior purpose and a wrongful use of process. *See supra* note 19; *Shoney's, Inc. v. Barnett*, 773 So. 2d 1015, 1024 (Ala. Civ. App. 1999) (stating that "[t]he tort of abuse of process is concerned with the wrongful *use* of process *after it has been issued*" (internal quotations omitted)).

33

or had knowledge of, procurement of the search warrant, and Appellees presented no evidence to rebut or impeach this sworn testimony.  Therefore, the district court should have granted USX judgment as a matter of law on the abuse of process counterclaim.

4.   Tortious Interference With Business Relations

To prove tortious interference with business relations in Alabama, a plaintiff must show: (1) the existence of a contract or business relation, (2) defendant's knowledge of the contract or business relation, (3) intentional interference by the defendant with the contract or business relation, (4) absence of justification for the defendant's interference, and (5) damage to the plaintiff as the result of the defendant's interference.  *See Mut. Savs. Life Ins. Co. v. James River Corp. of Va.*, 716 So. 2d 1172, 1180 (Ala. 1998).  In addition, a plaintiff must show "some evidence of fraud, force, or coercion[] on the defendant's part." *Joe Cooper & Assocs., Inc. v. Cent. Life Assurance Co.*, 614 So. 2d 982, 986 (Ala. 1992) (citing *Griese-Traylor Corp. v. First Nat'l Bank of Birmingham*, 572 F.2d 1039, 1045 (5th Cir. 1978)); *accord Barber v. Business Prods. Ctr., Inc.*, 677 So. 2d 223, 227 (Ala. 1996).

TIECO's claim under this tort hinges on interactions between USX  and TIECO's suppliers.  Specifically, while USX was reviewing TIECO's seized

records, two of TIECO's suppliers were also present and reviewing the documents; on one occasion, USX provided an invoice to a supplier. These minimal interactions, as a matter of law, did not constitute tortious interference with business relations. Appellees have presented no evidence that USX intentionally interfered with a contract or business relation between TIECO and its suppliers. Furthermore, Appellees have not pointed to any evidence indicating the use of fraud, force, or coercion by USX. The district court should have granted USX judgment as a matter of law on the counterclaim for tortious interference with business relations.

## 5. Defamation

As previously noted, unlike the other counterclaims, the defamation action sought relief for both Mr. Yielding and TIECO. Appellees contend that USX is liable for defamation because its outside counsel, Mr. Hayslip, compared TIECO and Mr. Yielding to Jeffrey Dahmer, the convicted mass murderer.[21]

---

[21] The allegedly defamatory statement is fully set forth above. *See supra* Part I.A.6.

Under Alabama law,[22] whether a statement is reasonably capable of defamatory meaning is a question of law for the court. *See Blevins v. W.F. Barnes Corp.*, 768 So. 2d 386, 390 (Ala. Civ. App. 1999) (citing *Harris v. School Annual Publ'g Co.*, 466 So. 2d 963, 964 (Ala. 1985)); *Drill Parts*, 619 So. 2d at 1289-90. A statement is defamatory if it "tends . . . to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Blevins*, 768 So. 2d at 389-90 (internal quotations omitted) (citing *Harris*, 466 So. 2d at 964). When analyzing an allegedly defamatory statement, a court must give the statement's language the "meaning that would be ascribed to the language by a reader or listener of average or ordinary intelligence, or by a common mind." *Id.* at 390 (internal quotations omitted) (citing *Camp v. Yeager*, 601 So. 2d 924, 927 (Ala. 1992)); *see also Labor Review Publ'g Co. v. Galliher*, 45 So. 188, 190 (Ala. 1907). Furthermore, the "alleged defamatory matter must be construed in connection with other parts of the

---

[22] To state a defamation claim in Alabama, a plaintiff must allege: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication of that statement to a third party; (3) fault amounting at least to negligence on the part of the defendant; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement. *McCaig v. Talladega Pub'g Co.*, 544 So. 2d 875, 877 (Ala. 1989) (citing Restatement (Second) of Torts § 558 (1977)).

conversation or publication, and the circumstances of its publication . . . ." *Marion v. Davis*, 114 So. 357, 359 (Ala. 1927); *see also Drill Parts*, 619 So. 2d at 1289.

Equally well established is the rule that once a plaintiff has alleged that the statement defamed him in a certain manner, the plaintiff is thereafter bound by that construction of the statement. *See Smith Bros. & Co. v. W.C. Agee & Co.*, 59 So. 647, 648 (Ala. 1912) (citing *Gaither v. Advertiser Co.*, 14 So. 788 (Ala. 1894)); *Labor Review*, 45 So. at 190. In their amended complaint, Appellees averred that Mr. Hayslip's statement was an attempt by USX to compare TIECO to the "vile and evil" nature of Jeffrey Dahmer. Am. Compl. ¶ 2, at 33. Similarly, at trial, Appellees' counsel argued that, with Mr. Hayslip's statement, "[USX] said [Mr. Yielding] is like Jeffrey Dahmer." Trial Tr. 1759. Appellees are bound by these constructions of Mr. Hayslip's statement.

In light of the circumstances and context of Mr. Hayslip's statement, no reasonable person could have construed it to be defamatory as alleged by Appellees. The context was USX's allegations concerning fraud by TIECO and Appellees' allegations concerning an unethical and illegal investigation by the AG and USX. Under these circumstances, any reasonable person who heard or read Mr. Hayslip's statement would have inferred the following: USX was strongly

37

implying, through a distasteful metaphor, that Appellees were guilty of fraud and that Appellees' ethics complaint was without merit.

Such an implication was capable of having defamatory meaning in that Appellees' reputation could have been diminished if the community believed Appellees were committing fraud and filing frivolous complaints. But Appellees did not argue this construction of the statement to the jury. Rather, Appellees averred that their reputation was diminished because the community, after hearing Mr. Hayslip's statement, would believe they were comparable, in some fashion, to a convicted mass murderer. Considering the circumstances surrounding Mr. Hayslip's statement, no reasonable person could have thought Appellees were similar to a mass murderer. Therefore, the district court erred by not granting judgment as a matter of law to USX on the defamation counterclaim.

6. Civil Conspiracy

Under Alabama law, civil conspiracy is not an independent action; rather, a plaintiff must have a viable underlying cause of action. *See Drill Parts*, 619 So. 2d at 1289. As is evident from our discussion above regarding the other counterclaims, Appellees have failed to present sufficient evidence of any underlying cause of action. Therefore, the district court should have granted USX judgment as a matter of law on the civil conspiracy counterclaim.

## II. ATTORNEY'S FEES AND COSTS

Pursuant to 42 U.S.C. § 1988(b), Appellees were awarded $1,332,024.86 in attorney's fees. Section 1988(b) permits attorney's fees to the "prevailing party" for actions brought under various civil rights provisions, including 42 U.S.C. § 1983. As is evident from Part I.C.1 of our opinion, Appellees did not prevail on the § 1983 claim. Therefore, insofar as it awarded attorney's fees, the judgment must be vacated.

Appellees were also awarded $110,744.4 in costs. Fed. R. Civ. P. 54(d) permits a court to award costs, other than attorney's fees, to the prevailing party. In light of our holdings, further proceedings are required in the district court, as it is no longer clear which party should be considered the prevailing party. *Cf. Terry Props., Inc. v. Standard Oil Co.*, 799 F.2d 1523, 1540 (11th Cir. 1986). Thus, insofar as it awarded costs, the judgment must be vacated and remanded for reconsideration by the district court.[23]

---

[23] "[A] court may only tax costs as authorized by statute." *EEOC v. W&O, Inc.*, 213 F.3d 600, 622-23 (11th Cir. 2000) (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445, 107 S. Ct. 2494, 2499 (1987)). The parties agree the award of costs is governed by 28 U.S.C. § 1920. Thus, if a cost is not enumerated in § 1920, Appellees should not have requested reimbursement. Nevertheless, many of Appellees' requests for costs cannot be located in § 1920 (or any other statute). For instance, Appellees sought costs incurred in defending the AG's criminal prosecution, *see Loranger v. Stierheim*, 10 F.3d 776, 782 (11th Cir. 1994), and they sought fees for their expert witnesses beyond the amount

## III. CONCLUSION

We hold as follows: (1) We AFFIRM the judgment as a matter of law in favor of Appellees on Appellant Heatherwood's claims. (2) We AFFIRM the dismissal of Appellant USX's claims. (3) We REVERSE the denial of Appellants' motion for judgment as matter of law on Appellees' counterclaims for a violation of 42 U.S.C. § 1983, malicious prosecution, abuse of process, tortious interference with business relations, defamation, and civil conspiracy. (4) We REVERSE the judgment of the district court awarding $6.8 million to Appellee TIECO and $375,000 to Appellee Yielding. (5) We VACATE the judgment awarding $1,442,769.27 in attorney's fees and costs to Appellees and REMAND for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, VACATED and REMANDED in part.

---

prescribed by 28 U.S.C. § 1821, *see Duckworth v. Whisenant*, 97 F.3d 1393, 1399 (11th Cir. 1996). On remand, if the occasion to award costs arises again, the district court should closely scrutinize its award.