[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 388 
In the years prior to 1997, Jerry Blevins, an attorney, maintained an office on the second floor of the Bell Building in Montgomery. That building is owned by W.F. Barnes Corporation; Frank Barnes is the president of W.F. Barnes Corporation (the corporation and Mr. Barnes will be referred to collectively as "Barnes"). In November 1996, Blevins's paralegal, Mary Parks, began complaining to Blevins that the smoke from the smoking lounge near her office was irritating her allergies.
Blevins told Ms. Parks to direct her complaints to the management of the building, so she complained to Barnes about the smoking lounge. Over the next several months, Ms. Parks corresponded with Barnes about the problem. When the problem was not resolved to her satisfaction, she enlisted the aid of her employer, Blevins. Blevins wrote to Barnes on February 20, 1997, stating that Ms. Parks demanded that smoking on the second floor of the Bell Building cease at noon on that date. In addition, the letter demanded $25,000 in settlement of Ms. Parks's "claims" against Barnes.
Smoking on the second floor did not cease on February 20. Blevins again wrote to Barnes, on February 21, stating that the settlement offer was withdrawn and that Ms. Parks "has every intention of proceeding with civil and criminal litigation." On February 24, Ms. Parks sued Barnes, seeking an ex parte temporary restraining order to ban smoking on the second floor of the Bell Building. The restraining order was granted on March 4, 1997. On that same date, Malcomb Daniels, a reporter with the MontgomeryAdvertiser newspaper, contacted Blevins for *Page 389 
information about Ms. Parks's lawsuit against Barnes. On March 5, the newspaper published an article on the lawsuit and the grant of the temporary restraining order.
On March 6, 1997, the newspaper ran a follow-up article on the lawsuit entitled "Building Owner Wants Lawyer Investigated." That article quoted Frank Barnes as saying:
 "He tried to extort money out of me because I refused to pay his demands."
In addition, the article reported that Mr. Barnes had written to the Alabama Bar Association and the attorney general's office to request an investigation of Blevins.
Mr. Barnes's letter to the attorney general's office contained the following passage:
 "Approximately one (1) month before the complaints began, [Blevins] and I had a candid conversation in his office about the success of the Bell Building. He asked how much money the building was producing and if I was satisfied with the purchase. I said that the building was doing well and grossing about $600,000.00 per year and [I was] very pleased with the building as an investment. There is NO question in my mind that Jerry Blevins was bleeding information about my finances and conspired with his employee in making false charges so they could sue and extort $25,000 in cash from me. . . . I don't feel like the City of Montgomery needs this type of an attorney that continuously files frivolous law suits."
Blevins sued Barnes and the newspaper, alleging defamation, invasion of privacy, and intentional infliction of emotional distress. He alleged no special damages, but instead proceeded on the theory that the defendants' statements were defamatory per se. See Drill Parts Service Co. v. Joy Mfg. Co.,619 So.2d 1280, 1289 (Ala. 1993) (stating that in a defamation action the allegedly defamatory statement either must have caused special damage to the plaintiff (defamation per quod) or be actionable irrespective of the harm caused (defamation per se)). The trial court entered a summary judgment for Barnes and the newspaper on all claims. Blevins appealed to the Alabama Supreme Court, which transferred the case to this court pursuant to Ala. Code 1975, § 12-2-7(6). On appeal, Blevins addresses the trial court's judgment only as it relates to his defamation claims; therefore, this court will not review that judgment as it relates to Blevins's claims alleging invasion of privacy and intentional infliction of emotional distress. Pardue v. Potter, 632 So.2d 470
(Ala. 1994) (issues not raised in a party's appellate brief are waived).
Our review of a summary judgment is de novo, and we apply the same standard the trial court applies. A motion for summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala.R.Civ.P. SeeWest v. Founders Life Assurance Co. of Florida, 547 So.2d 870,871 (Ala. 1989), and Bass v. SouthTrust Bank of Baldwin County,538 So.2d 794 (Ala. 1989), for further discussion of the application of the summary-judgment standard.
The tort of defamation involves the protection of the "reputation and good name" of the plaintiff. Michael L. Roberts 
Gregory S. Cusimano, Alabama Tort Law, § 24.0, 831 (1996).
 "The foundation of an action for libel or slander is a malicious injury to reputation, and any false and malicious imputation of crime or moral delinquency by one published of and concerning another, which subjects the person to disgrace, ridicule, odium, or contempt in the estimation of his friends and acquaintances, or the public, with resulting damage to his reputation, is actionable either per se or per quod. . . ."
Marion v. Davis, 217 Ala. 16, 18, 114 So. 357, 358-59 (1927). A defamatory comment is one that "`tends so to harm the reputation of another as to lower him in *Page 390 
the estimation of the community or to deter third persons from associating or dealing with him.'" Harris v. School Annual Publ'gCo., 466 So.2d 963, 964 (Ala. 1985) (quoting Restatement(Second) of Torts § 559 (1976)).
 "`The elements of a cause of action for defamation are "1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence; and 4) either actionability of the statement irrespective of special harm [(per se)] or the existence of special harm caused by the publication of the statement [(per quod)]."'"
Joy Mfg. Co., 619 So.2d at 1289 (quoting McCaig v. TalladegaPubl'g Co., 544 So.2d 875, 877 (Ala. 1989)).
There are two types of defamation: libel, which involves the use of print media to publish the defamatory comment, and slander, which involves the oral expression of a defamatory comment. Roberts, supra, at § 24.0.1. The comments Blevins objected to in Barnes's letter to the attorney general's office are libel, as is Barnes's statement as quoted in the newspaper article. However, Barnes's statement itself, although quoted in print media, is also slander, as to Barnes, because it was spoken
to the reporter. Therefore, to determine whether the summary judgment for both the newspaper and Barnes was legally correct, we must examine both the tort of libel per se and the tort of slander per se.
 "There is a distinction between actions of libel predicated on written or malicious aspersions of character, and actions of slander resting on oral defamation, too well grounded in the law to be now questioned. This distinction, however, is merely in respect to the question as to whether the imputed language or words are actionable per se.
 "In cases of libel, if the language used exposes the plaintiff to public ridicule or contempt, though it does not embody an accusation of crime, the law presumes damage to the reputation, and pronounces it actionable per se. [To] constitute slander actionable per se, there must be an imputation of an indictable offense involving infamy or moral turpitude. . . ."
Marion, 217 Ala. at 18, 114 So. at 359.
Whether the statements at issue in a defamation case are reasonably capable of a defamatory meaning is a question of law.Harris, 466 So.2d at 964. If, as Barnes and the newspaper contend, the statements in the present case are not reasonably capable of a defamatory meaning, there is no issue of fact, and the summary judgment was proper. Id. at 964-65. If, however, the statements are reasonably capable of a defamatory meaning, then "`it is . . . for the jury to say whether [the statement was] in fact so understood.'" Camp v. Yeager, 601 So.2d 924, 927 (Ala. 1992) (quoting W. Page Keeton et al., Prosser Keeton on Torts § 111, at 781 (5th ed. 1984)).
When examining the allegedly defamatory statements, a court must give the language used "that meaning that would be ascribed to the language by a reader or listener of `average or ordinary intelligence, or by a common mind.'" Camp, 601 So.2d at 927 (quoting Loveless v. Graddick, 295 Ala. 142, 148, 325 So.2d 137,142 (1975)). Specifically in regard to a newspaper article, a court must consider "whether an ordinary reader or a reader of average intelligence, reading the article as a whole, would ascribe a defamatory meaning to the language." Joy Mfg. Co., 619 So.2d at 1289 (citations omitted). "If the words employed in the allegedly libelous publication impute dishonesty or corruption to an individual, they are actionable per se," as are "words . . . which directly tend to prejudice anyone in his office, profession, trade or business, or in any lawful employment by which he may gain his livelihood." Gray v. WALA-TV, 384 So.2d 1062, 1065
(Ala. 1980) (citations omitted). *Page 391 
The Allegedly Slanderous Statement Made by Barnes to the Reporter
To decide whether the oral statement made by Barnes to the reporter — that Blevins "tried to extort money out of me because I refused to pay his demands" — is slander per se, we must first determine whether it "imput[es] [to Blevins] . . . an indictable offense." Blevins argues that the use of the word "extort" by Barnes conveyed to the hearer the idea that Blevins was guilty of extortion, which is a crime under Alabama law. However, as the newspaper argues, the word "extort" does not have the same meaning as the word "extortion."
The crime of "extortion" is defined as "knowingly obtain[ing] by threat control over the property of another, with intent to deprive him of the property." Ala. Code 1975, §13A-8-13. The verb "extort," however, includes the meaning "to obtain from a person by force, intimidation, or undue or illegal power" and the meaning "to gain especially by ingenuity or compelling argument." Miriam Webster's Collegiate Dictionary 412 (10th ed. 1997). In addition, the word "extort," in the context of Barnes's remarks, is what the United States Supreme Court has characterized as "rhetorical hyperbole, a vigorous epithet used by [Barnes] who considered [Blevins's] negotiating [tactics] extremely unreasonable." Greenbelt Coop. Publ'g Ass'n v. Bresler,398 U.S. 6, 14 (1970) (characterizing the word "blackmail" as rhetorical hyperbole and unable to support a libel or slander claim in the context in which it was used); see also Rush v. PhiladelphiaNewspapers, Inc., [Super. Ct. No. 3189 Philadelphia 1998, June 9, 1999 732 A.2d 648 (Pa.Super.Ct. 1999) (characterizing the word "patronage" as rhetorical hyperbole and not capable of supporting a defamation claim).
Because the word "extort" is not confined to its meaning that suggests the crime of extortion and because the use of the word in the context in which it was spoken indicates that it was rhetorical hyperbole, we conclude that Barnes's statement did not amount to slander per se because it did not charge Blevins with an indictable offense. See Marion, 217 Ala. at 18, 114 So. at 359. Therefore, the summary judgment for Barnes on the slander count was proper.
Allegedly Libelous Statement Printed in the Montgomery Advertiser Article
Barnes's statement that Blevins "tried to extort money out of me because I refused to pay his demands" was printed by the newspaper in one of its articles on Ms. Parks's lawsuit against Barnes. Blevins bases his claims against the newspaper on the printing of Barnes's statement. He argues that the newspaper libeled him. To succeed on this claim, Blevins must prove that the comment "impute[d] dishonesty or corruption to [him] . . . [or] directly tend[ed] to prejudice [him] in his . . . profession. . . ."Gray, 384 So.2d at 1065. We must consider Barnes's quoted comment in light of the article as a whole. Joy Mfg. Co., 619 So.2d at 1289.
The article that contains the subject quotation began: "The owner of a downtown building on Wednesday said a Montgomery lawyer demanded $25,000 from him to settle a lawsuit over smoking in the building." The quotation from Barnes followed that opening sentence. The article further explained the communications between Blevins, as attorney for Ms. Parks, and Barnes about an attempted settlement of Ms. Parks's "claims" against Barnes.
In light of the content of the rest of the article, we cannot say that Barnes's quoted statement about Blevins's attempt to "extort" money would prejudice Blevins in his profession. The average reader could easily see that Barnes believed the lawsuit was unwarranted and that the settlement offer of $25,000 was simply a way for the attorney to recover money for his client without litigation. However, Blevins's attempt to settle the lawsuit before resorting to litigation was an appropriate course of conduct for an attorney. We fail to see *Page 392 
how Barnes's comment, when read in context with the remainder of the article, impugns Blevins's professional reputation. Therefore, the summary judgment on Blevins's libel claim against the newspaper is affirmed.
Allegedly Libelous Statements Written by Barnes to the Attorney General
To succeed on his libel claim against Barnes based upon Barnes's letter to the attorney general, Blevins must prove that the comments in that letter "impute[d] dishonesty" to him or "directly tend[ed] to prejudice [him] in his . . . profession."Gray, 384 So.2d at 1065. The letter contained allegations that Blevins had purposefully sought information about Barnes's finances, that Blevins and his employee had conspired to make false complaints about the smoke in the Bell Building, and that Blevins and his employee had so conspired with the intention of seeking $25,000 from Barnes to settle a frivolous lawsuit. The letter also stated that Barnes refused to pay "extortion" to Blevins to prevent the instigation of litigation.
Alabama cases have not discussed in detail the requirement that the allegedly libelous statement "directly tend to prejudice [the libel plaintiff] in his profession." However, the Missouri Supreme Court has discussed that requirement and has stated:
 "`[The defamatory] words . . . must be such, if true, . . . as would disqualify a person or render him less fit properly to fulfill the duties incident to the special character he has assumed. Words to be actionable as disparaging a person in his calling must touch him in his office, profession or trade. They must impeach either his skill or his knowledge, or his official or professional conduct. . . . [T]he disparaging words . . . must affect the plaintiff in some way which is peculiarly harmful to one engaged in his trade.'"
Jacobs v. Transcontinental Western Air, Inc., 358 Mo. 674, 678,216 S.W.2d 523, 525 (1948); see also Swafford v. Miller,711 S.W.2d 211, 215 (Mo.Ct.App. 1986).
The comments contained in the letter are quite capable of harming Blevins in his profession. As an attorney, Blevins is subject to the Rules of Professional Conduct. The preamble to those rules states:
 "A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. . . ."
The preamble also states that "[a]s negotiator, a lawyer seeks a result advantageous to the client but consistent with requirements of honest dealings with others." Rule 8.4(c) states that "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation" is professional misconduct. The allegations that Blevins discerned Barnes's financial state and then conspired with his employee to bring a false and frivolous lawsuit to coerce from Barnes a payment of $25,000 are broad enough to charge Blevins with professional misconduct. We conclude that the language in the letter is capable of a defamatory meaning. However, Barnes also argues that his letter is protected by privilege.
The entire letter focuses on Barnes's complaints about Blevins's conduct in initiating the lawsuit against him. Barnes argues that his comments in the letter are absolutely privileged because they are directly related to a judicial proceeding. SeeWalker v. Majors, 496 So.2d 726 (Ala. 1986). We disagree. Barnes misunderstands the scope of the privilege explained inWalker.
In Walker, the plaintiff sued a real estate agent for making allegedly defamatory statements contained in a letter from the real estate agent to prospective purchasers of the plaintiff's property. Walker, 496 So.2d at 727. The agent had procured the purchasers under an oral listing agreement and had attempted to tender earnest money to the plaintiff. Id. The *Page 393 
plaintiff declined to sell the property, and the agent returned to the purchasers their earnest-money checks. Id. In letters written to the purchasers, the agent requested that the purchasers keep the checks in case they were needed as evidence because he intended to sue the plaintiff for breach of contract "to recover for the damages I have suffered as a result of [the plaintiff's] fraudulent conduct." Id. at 727-28.
The supreme court held that the letters in Walker were absolutely privileged as communications preliminary to a proposed judicial proceeding. Id. at 729. Barnes contends that his letter to the attorney general's office falls within this privilege because, Barnes says, it was directly related to Ms. Parks's lawsuit. For the privilege to exist, the questioned communication must have "`some relation to the proceeding.'" Id. (quotingRestatement (Second) of Torts § 587 (1977)). The Walker court further explained, "`[T]his privilege, however, is not a license which protects every slanderous publication or statement made in the course of judicial proceedings. It extends only to such matters as are relevant or material to the litigation. . . .'" Id.
(quoting O'Barr v. Feist, 292 Ala. 440, 446, 296 So.2d 152, 157
(1974)). This "`standard is not met merely by showing that the defamatory comments were triggered by some pending lawsuit or the facts involved therein.'" Barnett v. Mobile County Personnel Bd.,536 So.2d 46, 52 (Ala. 1988) (quoting Brown v. Collins,402 F.2d 209, 214 (D.C. Cir. 1968)). "[W]hether the communication was privileged or not by reason of its character, or the occasion on which it was made, is a question of law to be decided by the court." Walker, 496 So.2d at 730.
The mere fact that Barnes's comments about Blevins related to the fact that Blevins was pursuing litigation against Barnes is not sufficient to elevate his comments to those absolutely privileged because of their relation to a judicial proceeding. Certainly, Barnes's comments about Blevins's alleged "bleeding" of information about his finances and about Blevins's alleged conspiracy with Ms. Parks are not relevant or material to the litigation. Instead, they are simply comments that attack the integrity of Blevins both as a person and in his profession. Therefore, as to Blevins's defamation claim based upon the letter to the attorney general's office the summary judgment is reversed. The cause is remanded for further proceedings on that claim.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Robertson, P.J., and Yates, J., concur in the result.
Monroe and Thompson, JJ., concur in part and dissent in part.