Dean Daugherty sued Liberty National Life Insurance Company ("Liberty National") and Perry Hartley, alleging defamation, intentional infliction of emotional distress, and interference with business relationships. Daugherty voluntary dismissed his claims of intentional infliction of emotional distress and interference with business relationships. The jury returned a verdict in favor of Daugherty on his defamation claim, awarding him $300,000 in compensatory damages, and the trial court entered a judgment on that verdict. Liberty National and Hartley appeal the denial of their motions for a judgment as a matter of law, motions for a remittitur of the compensatory-damages award, and motions for a new trial. We affirm the judgment of the trial court. *Page 154 
 I. Facts
Dean Daugherty was employed by Liberty National as an insurance agent from September 7, 1981, until November 1, 1993. Daugherty serviced the insurance needs of the community of Citronelle from 1986 until he left Liberty National in 1993. Daugherty was one of Liberty National's top insurance agents, and he formed close relationships with his customers in Citronelle. During his employment with Liberty National, Daugherty signed a noncompetition agreement, pursuant to which he agreed that if his employment with Liberty National terminated, he would not sell life insurance to Liberty National customers for a full year after the termination of his employment.
On November 1, 1993, Daugherty resigned from Liberty National and started the Daugherty-Bailey Insurance Co., Inc. Before Daugherty's resignation, Perry Hartley, then a Liberty National district manager, had evaluated Daugherty's job performance. Hartley indicated on the evaluation form that the reason for Daugherty's departure from Liberty National was that Daugherty had purchased an independent insurance agency. Hartley also indicated on the evaluation form that Daugherty had handled Liberty National accounts satisfactorily, that Daugherty had good sales ability, and that Hartley would reemploy Daugherty if he decided to reapply for employment with Liberty National.
Liberty National did not immediately hire an insurance agent to replace Daugherty, and after his departure, several of Daugherty's former customers began to contact him regarding the status of their life insurance policies. Daugherty told his former customers to contact Liberty National, and he provided them with a customer-service telephone number. When Liberty National failed to satisfy these customers, they again contacted Daugherty and requested that he provide them with life insurance. Daugherty sold several life insurance policies, issued by an insurance company other than Liberty National, to his former Liberty National customers. Those customers then either canceled their Liberty National life insurance policies or allowed those policies to lapse. An agent who replaces an existing insurance policy with another company with his or her company's policy is required by state insurance regulations to file a replacement form with the insurance company whose policy is being replaced so that that company may contact the customer to determine if the customer intended to lose his or her former insurance.
When the premiums on several Liberty National insurance policies held by customers in Citronelle became past due, Liberty National instructed its insurance agents to contact the holders of those policies in order to preserve its business. Liberty National had a company policy requiring its insurance agents to collect affidavits from former customers indicating whether a former Liberty National insurance agent had replaced their Liberty National insurance policy with a policy issued by another company. If an insurance policy had been replaced by a former Liberty National insurance agent within the period prohibited by the noncompetition agreement, Liberty National would sue the former insurance agent in accordance with that noncompetition agreement.
Perry Hartley contacted several of the Citronelle policyholders whose policies had lapsed. Hartley learned that many of those policyholders had purchased new life insurance policies through Daugherty. One such policyholder was Ouida Landrum. Hartley visited Landrum sometime in 1994 or 1995. Lois Ott, Ouida Landrum's niece, was visiting her aunt on the occasion of Hartley's visit. Ott was also a *Page 155 
former Liberty National life insurance policyholder who had purchased a new life insurance policy through Daugherty.
According to Ott, Hartley told Landrum that Daugherty was one of the "sorriest" insurance agents Liberty National had ever had; that Daugherty was selling insurance policies he knew were no good; that Daugherty was "pocketing" the money from the sale of those policies; that Daugherty had sold one person seven cancer policies, knowing the policies were not any good; and that Daugherty had been fired from Liberty National because he was stealing the company's money. Hartley also asked Landrum to sign an affidavit stating that Daugherty had replaced her Liberty National life insurance policy with a policy issued by another company.
After Hartley left Landrum's home, Ott telephoned Daugherty and told him what Hartley had said. Ott did not tell anyone other than Daugherty about the statements; however, she heard other people in the Citronelle community talking about similar remarks Hartley had made about Daugherty. Ott testified that the statements she heard Hartley make about Daugherty did not prevent her from doing business with Daugherty because she did not believe the statements were true. Several other former Liberty National life insurance policyholders telephoned Daugherty and informed him that Hartley had made similar comments to them and that Hartley had encouraged them to sign an affidavit stating that Daugherty had replaced their Liberty National life insurance policies.
On March 18, 1996, Daugherty sued Liberty National and Perry Hartley (hereinafter referred to collectively as "the Liberty National defendants"), alleging: 1) that Hartley, while acting within the line and scope of his employment with Liberty National, published false and defamatory statements about Daugherty; 2) that the Liberty National defendants intentionally or recklessly caused him to suffer emotional distress by making false and defamatory statements about him to his customers; and 3) that the Liberty National defendants intentionally interfered with the business relationships between Daugherty and his customers. Count one of Daugherty's complaint alleged that Hartley told Daugherty's customers that:
 "Dean Daugherty sold cancer policies to people that he knew had cancer. Dean Daugherty knew these policies were no good and Dean Daugherty was pocketing the premium from the sale of these policies. Dean Daugherty sold one old person seven different policies that were no good. Dean Daugherty was the sorriest agent that Liberty National had and Dean Daugherty was fired from Liberty National because of this."
Count two of Daugherty's complaint alleged that Hartley told Daugherty's customers that: "Dean Daugherty is engaging in illegal insurance practices."
On or around July 18, 2001, Liberty National moved for a summary judgment; on July 30, 2001, Perry Hartley moved for a summary judgment. The trial court denied the Liberty National defendants' motions for a summary judgment as to counts one, two, and four of Daugherty's complaint. Daugherty withdrew count three of his complaint, which alleged that the Liberty National defendants had intentionally or recklessly caused him to suffer emotional distress by making false and defamatory statements about him.
On August 3, 2001, Daugherty filed a motion for leave to amend his complaint to add additional facts, to allege that the defamatory statements constituted slander per se, and to add a claim that Daugherty had suffered personal humiliation and lost income as a result of the defamatory *Page 156 
statements. On August 10, 2001, the trial court denied that motion. At trial Daugherty agreed to withdraw his slander claim with regard to the statement alleged in count two of his complaint, i.e., that he had engaged in illegal insurance practices.
At the close of Daugherty's case, the Liberty National defendants moved for judgments as a matter of law, arguing that Daugherty had not specifically pleaded slander per se, that only the statement regarding Daugherty "pocketing the premium from the sale of [insurance] policies" could constitute slander per se and that the other statements alleged in count one could have supported only a finding of slander per quod, which would have required Daugherty to plead and prove special damages. At the close of their case, the Liberty National defendants renewed their motions for a judgment as a matter of law. The trial court denied those motions. The case went to the jury on only the first count of Daugherty's complaint. The jury returned a verdict in favor of Daugherty and awarded him $300,000 in compensatory damages.
On September 13, 2001, Liberty National renewed its motion for a judgment as a matter of law and filed a motion for a remittitur of the compensatory-damages award and a motion for a new trial. On September 14, 2001, Hartley renewed his motion for judgment as a matter of law and filed a motion for a remittitur of the compensatory-damages award and a motion for a new trial. On December 13, 2001, the trial court denied the Liberty National defendants' motions for a judgment as a matter of law, motions for a remittitur of the compensatory-damages award, and motions for a new trial, stating that the Liberty National defendants' actions constituted slander per se. The court stated that the Liberty National defendants had accused Daugherty of taking money that did not belong to him, i.e., stealing, and that, therefore, damages could be presumed. The court also found that there was sufficient evidence to indicate that Daugherty had experienced mental anguish over an extended period, supporting the jury's award of compensatory damages.
 II. Standard of Review
"`A judgment as a matter of law is proper only where there is a complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could differ and the moving party is entitled to a judgment as a matter of law.'"Southern Energy Homes, Inc. v. Washington, 774 So.2d 505, 510-11 (Ala. 2000), quoting Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303, 304
(Ala. 1997). In reviewing the denial of a motion for a judgment as a matter of law, this Court is required to view the evidence in a light most favorable to the nonmovant. Kmart Corp. v. Kyles, 723 So.2d 572, 573
(Ala. 1998). Therefore, where the evidence in the record is disputed, we present it in a light most favorable to Daugherty.
 III. Did the allegedly defamatory statements constitute slander per quod or slander per se?
The Liberty National defendants argue that the trial court erred when it denied their motions for a judgment as a matter of law because, according to the Liberty National defendants, Daugherty failed to state a claim that alleged slander per quod or slander per se. The Liberty National defendants contend that the trial court applied the wrong test to determine whether Hartley's statements constituted slander per se. Relying upon Ledbetter v. United Insurance Co., 845 F. Supp. 844
(M.D.Ala. 1994), the trial court held that "slander per se is committed when a *Page 157 
`defendant ascribes conduct to the plaintiff which is incompatible with the proper conduct of his lawful business, trade, profession. . . .'" See also Jenelle Mims Marsh and Charles W. Gamble, Alabama Law ofDamages § 36-27 (4th ed. 1999). Applying the Ledbetter test, the trial court concluded that the Liberty National defendants had made statements accusing Daugherty of taking money that did not belong to him, i.e., stealing, and that those statements constituted slander per se. The Liberty National defendants argue that the "indictable-offense test" is the proper test in Alabama to determine whether a communication is slanderous per se. However, it is unnecessary to reach the question whether the basis of the trial court's ruling is correct because this Court may affirm a trial court's judgment if it is supported on any valid legal ground. Mutual Assurance, Inc. v. Wilson, 716 So.2d 1160, 1165
(Ala. 1998).
Ceravolo v. Brown, 364 So.2d 1155 (Ala. 1978), decided significantly after the authorities cited in Gamble's Alabama Law of Damages § 36-27 n. 4, restated the test for determining whether an allegedly defamatory statement constitutes slander per se:
 "`The foundation of an action for libel or slander is a malicious injury to reputation, and any false and malicious imputation of crime or moral delinquency by one published of and concerning another, which subjects the person to disgrace, ridicule, odium, or contempt in the estimation of his friends and acquaintances, or the public, with resulting damage to his reputation, is actionable either per se or per quod. . . .
 "`There is a distinction between actions of libel predicated on written or printed malicious aspersions of character, and actions of slander resting on oral defamation. . . . This distinction, however, is merely in respect to the question as to whether the imputed language or words are actionable per se.
 "`In cases of libel, if the language used exposes the plaintiff to public ridicule or contempt, though it does not embody an accusation of crime, the law presumes damage to the reputation, and pronounces it actionable per se. While to constitute slander actionable per se, there must be an imputation of an indictable offense involving infamy or moral turpitude. . . .
 "`This distinction, however, does not deny the right to maintain an action for slander founded on oral malicious defamation subjecting the plaintiff to disgrace, ridicule, odium, or contempt, though it falls short of imputing the commission of such crime or misdemeanor. In such case the law pronounces the words actionable per quod only, and the plaintiff must allege and prove special damages as an element of the cause of action.'"
364 So.2d at 1156-57, quoting Marion v. Davis, 217 Ala. 16, 18,114 So. 357, 358-59 (1927) (emphasis added).
However, "[d]amage is implied by law when spoken words are found to be slander per se." Anderton v. Gentry, 577 So.2d 1261, 1263 (Ala. 1991), see also Sunshine Invs., Inc. v. Brooks, 642 So.2d 408, 410 (Ala. 1994). Words found to be slander per se "relieve the plaintiff of the requirement of proving `actual harm to reputation or any other damage' in order to recover nominal or compensatory damages." Nelson v. LapeyrouseGrain Corp., 534 So.2d 1085, 1092 (Ala. 1988), quoting W. Prosser and W. Keeton, The Law of Torts § 112, at 788 (5th ed. 1984).
When determining whether a statement is actionable as slander per se, a court must give the language used "that meaning that would be ascribed to the *Page 158 
language by a reader or listener of `average or ordinary intelligence, or by a common mind.'" Camp v. Yeager, 601 So.2d 924, 927 (Ala. 1992), quoting Loveless v. Graddick, 295 Ala. 142, 148, 325 So.2d 137, 142
(1975). Moreover, this Court has stated: "`When words from their general import appear to have been spoken with a view to defame a party, the court ought not to be industrious in putting a construction upon them different from what they bear in the common acceptation and meaning of them.'" Johnson v. Turner, 159 Ala. 356, 358, 47 So. 570, 571 (1908), quoting Wofford v. Meeks, 129 Ala. 349, 357, 30 So. 625, 627 (1901). Stated differently, the courts will not apply a forced construction in order to render the statement nondefamatory and thereby to relieve the defendant of liability. Marion v. Davis, 217 Ala. at 19, 114 So. at 359. Finally, the alleged slanderous statement must be construed in connection with the other parts of the conversation, in order to determine the context in which the statement was made. Marion, supra.
Daugherty contends that the statements that he alleges in count one of his complaint were made by the Liberty National defendants are slanderous per se because, he argues, the statements impute to him the offense of larceny. If we assume the statements alleged in count one are true, Hartley told one of Daugherty's customers that Daugherty had sold cancer policies to people he knew had cancer; that Daugherty knew that those policies were worthless; and that he was pocketing the premiums from the sale of those policies. At the time Hartley made the allegedly defamatory statements, Alabama's Criminal Code provided a criminal penalty for the misappropriation of funds collected by an insurance agent. Section27-8-28(b), Ala. Code 1975, provided:[1]
 "(b) Any agent or broker who, not being lawfully entitled thereto, diverts or appropriates such funds, or any portion thereof, to his own use shall, upon conviction, be guilty of larceny by embezzlement and shall be punished as provided by law as if he had stolen such funds."
(Emphasis added.) This Court has firmly held that larceny falls within the definition of an indictable criminal offense involving infamy or moral turpitude and that, therefore, words that impute the offense of larceny are slanderous per se. Sunshine Investments, 642 So.2d at 410;Nelson, 534 So.2d at 1091-92; Phillips v. Bradshaw, 167 Ala. 199,52 So. 662 (1910).
An insurance agent who knowingly sells worthless insurance policies and appropriates the premiums paid on those policies to his own use is also guilty of the crime of theft by deception. § 13A-8-2(2), Ala. Code 1975. The prior offenses of larceny and embezzlement and the offense of theft by deception are unified into the single offense of theft of property. See Ala. Code 1975, §§ 13A-8-2 through 13A-8-5 Commentary.
"A person commits the crime of theft of property if he:
 "(1) Knowingly obtains or exerts unauthorized control over the property of another, with the intent to deprive the owner of his property; or
 "(2) Knowingly obtains by deception control over the property of another, with intent to deprive the owner of his property."
§ 13A-8-2, Ala. Code 1975. The Liberty National defendants argue that Hartley's *Page 159 
statements did not impute to Daugherty the crime of theft. According to the Liberty National defendants, the verb "pocketing" has several harmless meanings, any or all of which could have been implied by Hartley's statements. The Liberty National defendants argue that the word "pocket" implied at best that Daugherty had done something dishonest, but that the use of that word did not clearly impute to Daugherty the offense of theft.
As support for their position that Hartley did not intend to imply that Daugherty had committed theft, the Liberty National defendants citeBlevins v. W.F. Barnes Corp., 768 So.2d 386, 391 (Ala.Civ.App. 1999), in which the Court of Civil Appeals held that a statement accusing the plaintiff of "extort[ing] money" did not amount to slander per se. The plaintiff in Blevins sued the defendant after the defendant told a newspaper reporter that the plaintiff "tried to extort money out of [the defendant] because [the defendant] refused to pay [the plaintiff's] demands." After considering the various definitions of the word "extort" and the context in which the word "extort" was used in the allegedly defamatory statement, the Court of Civil Appeals concluded that the word "extort" was merely rhetorical hyperbole, and that the defendant's statement did not constitute slander per se. 768 So.2d at 391.
The Liberty National defendants contend in their brief to this Court that The American Heritage Dictionary (4th ed. 2000) contains several meanings of the word "pocketing" that are harmless. Just as the Court of Civil Appeals held in Blevins — that the word "extort" has several meanings that do not suggest the crime of extortion — the Liberty National defendants argue that the word "pocketing" has several meanings that do not suggest the offense of theft. Blevins, however, was a decision by a lower appellate court; although under appropriate circumstances such a decision may be persuasive authority, it is not binding. Moreover, based upon the context in which the word "extort" was used, the Court of Civil Appeals could have reasonably concluded that the word "extort" was "rhetorical hyperbole" rather than an accusation that the plaintiff had committed an indictable offense.
According to the Liberty National defendants, The American HeritageDictionary defines the verb form of the word "pocket" as follows:
 "1. To place in or as if in a pocket. 2. To take possession of for oneself, especially dishonestly: pocketed the receipts from the charity dance. 3.a. To accept or tolerate (an insult, for example). b. To conceal or suppress: I pocketed my pride and asked for a raise."
Of these definitions of the word "pocket," the definition "[t]o take possession of for oneself, especially dishonestly" more closely describes the action that Hartley imputed to Daugherty. Several other dictionaries contain similar definitions of the word "pocket." Among the verb forms of the definition of "pocket" in The Random House Dictionary of the EnglishLanguage (2d ed. 1987) is "to take possession of as one's own, often dishonestly: to pocket public funds." The Oxford English ReferenceDictionary (2d ed. 1996) includes in its definitions of the verb form of the word "pocket" "appropriate, esp. dishonestly." The usage of the word "pocket" shown in The American Heritage Dictionary — "pocketed thereceipts from the charity dance" — The Random House Dictionary ofthe English Language — "to pocket public funds" — indicating the context in which those definitions apply, implies that one "pocketing" has taken something that does not belong to him or her, i.e., that he or she has committed theft. Indeed, according toMerriam-Webster's Collegiate Dictionary *Page 160 
(10th ed. 1999), "pocket" may also mean "to appropriate to one's own use: steal."
Hartley's statements did not suggest that Daugherty had "pocketed" the commission from his insurance sales — income to which Daugherty may have been entitled. The commonly understood meaning of Hartley's statement was that Daugherty had sold worthless goods in a transaction that did not entitle him to keep the proceeds of the sale but that obligated him to pass them on to Liberty National Insurance Company in order for the purchaser to receive any benefit. We decline Liberty National's invitation "`to be industrious in putting a construction upon [the words used in Hartley's statement] different from what they bear in the common acceptation and meaning of them.'" Johnson, 159 Ala. at 358,47 So. at 571, quoting Wofford, 129 Ala. at 357, 30 So. at 627. Thus, we conclude that Hartley's statements implied that Daugherty had committed the crime of theft. Having imputed to Daugherty the offense of theft, Hartley's statements were slander per se, and relieved Daugherty of the requirement of proving "actual harm to reputation or any other damages." See Nelson, 534 So.2d at 1092.
 IV. Did Daugherty's testimony that he had an "excellent" reputation rebut the presumption of injury to his reputation?
The Liberty National defendants argue that even if Hartley's statements imputed to Daugherty "an indictable criminal offense involving infamy or moral turpitude," Daugherty has nevertheless failed to state a cause of action for slander per se because, they say, he presented no evidence of damage to his reputation. At trial Daugherty testified that he knew of no one who had canceled or allowed to lapse a life insurance policy he had sold them, based on Hartley's statements. When asked about his reputation in the Citronelle community, Daugherty testified: "I think it's a real good reputation. I think it's very good. Excellent." Sybil Daugherty, Daugherty's wife, also testified regarding his reputation in the community. When asked what Daugherty's reputation was in the community, she answered: "Excellent. Everybody thinks the world of him." The Liberty National defendants argue that if, for purposes of slander per se, damage to the victim's reputation is presumed, the presumption in this case was rebutted by Daugherty's testimony that his reputation was "excellent."
The general rule is that when a defamatory statement is slanderous per se, the law infers injury to reputation and the plaintiff is relieved of the requirement of proving actual harm to reputation or any other damage. Nelson, 534 So.2d at 1092; see also W. Prosser and W. Keeton, TheLaw of Torts § 112, at 788 (5th ed. 1984). However, this Court has not heretofore addressed whether the presumption of injury to reputation may be rebutted by the plaintiff's testimony that the alleged defamatory statements did not harm his or her reputation.
In Tidmore v. Mills, 33 Ala. App. 243, 256, 32 So.2d 769, 779-80
(1947), a defendant sought to defeat the presumption of injury to character from a publication that was defamatory per se by attempting to prove "that the reputation of the plaintiff below was good in the community in which he lived and that this estimate extended up to the time of the trial in the lower court." The Court of Appeals observed that "this offer [of proof] was made on the theory and for the purpose of showing that the plaintiff had not, in fact, been damaged in reputation by the publication or at least it was competent in mitigation of damages." 33 Ala. App. at 256, 32 So.2d at 779. After noting the general rule that the law *Page 161 
presumes damage to reputation as a natural and probable consequence of a statement that is defamatory per se and noting further that evidence of the character of the plaintiff in a libel action was admissible at the plaintiff's behest to show malice, the court rejected the defendant's evidence. The Tidmore court concluded:
 "Our courts have considered the propriety of the introduction of the general character of the plaintiff in libel actions from a very different approach and purpose from those attempted in the instant case.
". . . .
 "A review of the authorities will unquestionably show that the general, character evidence of the plaintiff in libel cases is justified and approved for purposes and reasons in no way related or concomitant to those for which the evidence in the case at bar was tendered.
 "We entertain the view that it would be anomalous conclusion for us to sanction the introduction of the evidence under review. To do so would have the effect of destroying, or at least seriously jeopardizing, the prevailing presumption of injury to reputation in the publication of a libelous statement."
33 Ala. App. at 256, 32 So.2d at 780. We agree with the Court of Appeals and are likewise disinclined to permit evidence that would have the effect of "destroying, or at least seriously jeopardizing, the prevailing presumption of injury to reputation." 33 Ala. App. at 256,32 So.2d at 780.
Moreover, Daugherty's testimony that his reputation was "excellent" was elicited in the course of a trial in which the Liberty National defendants presented evidence of "bad character," including evidence indicating that Daugherty had solicited former Liberty National customers in violation of his noncompetition agreement, that Daugherty had willfully failed to inform Liberty National that he had replaced Liberty National life insurance policies with policies from other companies, and that Daugherty had violated state insurance regulations. Thus, Daugherty's testimony of his "excellent" reputation could be interpreted as a rebuttal of Liberty National's attack on his character.
We cannot elevate Daugherty's testimonial evidence of his good character to the status of a judicial admission. Wigmore defines a judicial admission as:
 "[a]n express waiver made in court or preparatory to trial by the party or his attorney conceding for the purposes of the trial the truth of some alleged fact. . . . This is what is commonly termed a solemn — i.e., ceremonial or formal — or judicial admission or stipulation. It is, in truth, a substitute for evidence, in that it does away with the need for evidence.
 "This judicial admission is sharply marked off from the ordinary or quasi-admission — which indeed does not deserve to bear the same name. The latter is merely an item of evidence, available against the party on the same theory on which a self-contradiction is available against a witness. . . . [T]he [quasi-admission] is not conclusive; but . . . the [judicial admission] is conclusive."
9 John Henry Wigmore, Evidence in Trials at Common Law § 2588 at 821-22 (Chadbourn rev. ed. 1981) (footnotes and emphasis omitted). "It is of the nature of an admission, plainly, that it be by intention an act of waiver relating to the opponent's proof of the fact and not merely a statement of assertion or concession made for some independent purpose." 9 Wigmore, § 2594(2) at 833 (footnote omitted). See also Webb v.State, 539 So.2d 343, 352 *Page 162 
(Ala.Crim.App. 1987). At most, Daugherty's testimony created a jury question as to his good character, to be weighed against the Liberty National defendants' evidence of disreputable acts.
Nevertheless, even if we were to conclude that Daugherty's testimony regarding his "excellent" reputation in the community was admissible as evidence "destroying, or at least seriously jeopardizing, the prevailing presumption of injury to reputation," Tidmore, 33 Ala. App. at 256,32 So.2d at 780, when the plaintiff has proven slander per se, the law presumes injury to reputation and mental suffering. See New York TimesCo. v. Sullivan, 273 Ala. 656, 686, 144 So.2d 25, 50 (1962), reversed on other grounds, 376 U.S. 254 (1964) ("`It is not necessary, in order to recover general damages for words which are actionable per se, that the plaintiff should have suffered any actual or constructive pecuniary loss. In such action, the plaintiff is entitled to recover as general damages for the injury to his feelings which the libel of the defendant has caused and the mental anguish or suffering which he had endured as a consequence thereof.'") (quoting Johnson Publishing Co. v. Davis,271 Ala. 474, 489, 124 So.2d 441, 452 (1960)) (emphasis added); Comer v.Advertiser Co., 201 Ala. 159, 160, 77 So. 685, 686 (1918) (in defamation per se case, plaintiff was entitled to a presumption of actual damage from "mental suffering and loss or impairment of business or reputation") (emphasis added); Starks v. Comer, 190 Ala. 245, 254,67 So. 440, 443 (1914) ("The communication being libelous per se . . . the law presumes such general damage to the plaintiff as mental sufferingand injury to his reputation, and it necessarily follows that these elements of damage need not be alleged in the complaint not supported by proof.") (emphasis added). Thus, even if Daugherty's evidence concerning his good character negated any injury to his reputation, because the defamation involved in this case was slander per se, the law recognizes a right to recover for mental anguish.
 V. Was the compensatory-damages award supported by the evidence?
The Liberty National defendants argue that the trial court erred in denying their motions for a remittitur and their motions for a new trial, because, they argue, the jury's award of $300,000 in compensatory damages was not supported by the evidence. According to the Liberty National defendants, a jury verdict awarding damages for mental anguish is subject to strict scrutiny in a case where the plaintiff has suffered no physical injury or offers little or no direct evidence concerning the degree of his alleged mental anguish. See Kmart Corp., 723 So.2d at 578. The Liberty National defendants argue that the only evidence regarding Daugherty's alleged mental anguish was the "nonspecific" and "indefinite" testimony of Daugherty and his wife and that this testimony alone is not sufficient to sustain a $300,000 compensatory-damages award. Based upon the previous discussion of the presumption of injury to reputation, we cannot assume that the entire award should be viewed as related only to mental anguish. Nevertheless, this Court has stated the following with respect to the quantum of proof necessary to support damages for mental anguish:
 "`Under Alabama law, the presence of physical injury or physical symptoms is not a prerequisite for a claim for damages for mental anguish. "The plaintiff is only required to present some evidence of mental anguish, and once the plaintiff has done so, the question of *Page 163 
damages for mental anguish is for the jury." The amount of the jury's award is left to the jury's sound discretion, and the jury's award will not be set aside absent a clear abuse of discretion. Also, a jury's verdict is presumed correct, and that presumption is strengthened by the trial court's denial of a motion for new trial.'"
Horton Homes, Inc. v. Brooks, 832 So.2d 44, 53 (Ala. 2001), quoting KmartCorp., 723 So.2d at 578. The testimony of a witness is admissible to prove that he or she suffered mental anguish as a result of the alleged wrongdoing by the defendant. Orkin Exterminating Co. v. Jeter, 832 So.2d 25
(Ala. 2001). However, we give stricter scrutiny to an award of damages for mental anguish where the victim has offered little or no direct evidence concerning the degree of suffering he or she has experienced.Horton Homes, supra. "Mental anguish includes anxiety, embarrassment, anger, fear, frustration, disappointment, worry, annoyance, and inconvenience." Horton Homes, 832 So.2d at 53.
Daugherty testified that from 1994 until he sued the Liberty National defendants in 1996, he received approximately 25 to 30 telephone calls from former Liberty National customers regarding visits they had received from Hartley. Daugherty testified that as a result of the telephone calls he began to develop high blood pressure, became very irritable, and felt terrible. Daugherty testified that the stress related to Hartley's statements adversely impacted his relationship with his wife. He testified that during this period he would go home and say things to his wife that he should not have said to her. Daugherty testified that as a result of Hartley's statements he became fearful that he would lose his insurance license, that he would be sued, and that he would not be able to support his family. Daugherty testified that he had worked all his life to build a good name, and he felt that his name was being destroyed.
Sybil Daugherty, Daugherty's wife, also testified regarding Daugherty's mental anguish. She testified that since learning of Hartley's statements, Daugherty had been depressed, worried, and anguished. She testified that Daugherty could not sleep at night. She testified that Daugherty often woke up in the middle of the night and that when he did she and he would sit and talk. She testified that Daugherty worried a lot about his reputation and that Hartley's statements had caused Daugherty to become irritable with her at times. The fact that the Liberty National defendants may not have succeeded in ruining Daugherty's reputation does not justify a reduction of the damages awarded for mental anguish sustained while worrying day and night as to whether the slanderous statements would gain traction in the community.
The testimony of Daugherty and his wife described mental anguish over a period of approximately two years in sufficient detail to permit a thorough cross-examination. While the jury's verdict of $300,000 is higher than a Justice of this Court, sitting as a juror, might have awarded, that is not the test to determine whether such an award is excessive. This award is sufficiently grounded in evidence to withstand the strict scrutiny of the jury's verdict mandated by Kmart.
 VI. Conclusion
For the foregoing reasons, the trial court's order denying the Liberty National defendants' motions for a judgment as a matter of law, motions for a remittitur of the compensatory-damages award, and motions for a new trial is affirmed.
AFFIRMED. *Page 164 
MOORE, C.J., and HOUSTON, JOHNSTONE, and WOODALL, JJ., concur.
[1] Section 27-8-28, Ala. Code 1975, was repealed by Act No. 2001-702, p. 1509, § 16, effective January 1, 2002.