SMITH, Justice.
 

 Cherrie Lawson appeals from a judgment as a matter of law entered against her in an action she filed against William H. Moore, Jr., M.D., and Whittington, Moore & Kouri, P.C. (collectively referred to as “the Moore defendants”). We reverse and remand.
 

 Facts and Procedural History
 

 On December 27, 2003, Lawson went to the emergency room of Baptist Medical Center South in Montgomery with complaints of pain in her abdomen and pelvic area. Dr. Henry Kurusz, an emergency-room physician, examined Lawson and ordered that she undergo several tests, including a pregnancy test and an ultrasound. The pregnancy test was positive, and the ultrasound revealed the existence of a cyst on Lawson’s left ovary. The ultrasound did not, however, definitely show the existence of an intrauterine pregnancy, and the hospital records from Lawson’s visit indicate that Lawson informed Dr. Kurusz that she had previously experienced an ectopic pregnancy.
 
 [1]
 
 Dr. Kurusz diagnosed Lawson as being at risk for a miscarriage, and he discharged her with instructions to return to the hospital in 48 hours for additional examination.
 

 Lawson did not return to the hospital in accordance with Dr. Kurusz’s instructions. However, on December 31, 2003, she again went to the emergency room of the hospital with complaints of abdominal pain. A different emergency-room physician, Dr. James Bradwell, examined Lawson and ordered a repeat ultrasound, a quantitative pregnancy test, and a urinalysis.
 

 At 3:30 a.m. on the morning of January 1, 2004, Dr. Bradwell asked Dr. Moore, an obstetrician/gynecologist, to examine Lawson, and Dr. Moore agreed to do so. According to Dr. Moore, Dr. Bradwell stated that Lawson had an ectopic pregnancy and that the ultrasound revealed the presence
 
 *419
 
 of a pseudo- or “false” gestational sac located in the endometrial cavity.
 
 [2]
 
 After examining Lawson, Dr. Moore diagnosed her as having an ectopic pregnancy.
 

 Dr. Moore instructed Lawson that an ectopic pregnancy is a serious, life-threatening condition and that she would be monitored closely pending a follow-up laboratory analysis. He discussed giving her the drug methotrexate
 
 [3]
 
 to terminate her pregnancy; he also told Lawson that she might need surgical intervention.
 

 On the morning of January 2, 2004, Dr. Moore again evaluated Lawson. Lawson continued to be in tremendous pain, and Dr. Moore again discussed her treatment options. He provided her with medical literature discussing methotrexate and its benefits and the risks of treatment with that drug. That afternoon, Lawson informed Dr. Moore that she had decided to undergo the methotrexate treatment.
 
 [4]
 
 Lawson received an injection of methotre-xate later that evening.
 

 Lawson remained in the hospital under Dr. Moore’s care until January 4, 2004. After her discharge from the hospital, Lawson continued to receive treatment from Dr. Moore at his office, including follow-up ultrasounds. Ultimately, the methotrexate injection terminated Lawson’s pregnancy. On January 30, 2004, Dr. Moore performed a dilation-and-curettage procedure to remove the remnants of the terminated pregnancy.
 

 On December 23, 2005, Lawson sued the Moore defendants, alleging that at the time she received the methotrexate injection she had in fact had a viable intrauterine pregnancy and that Dr. Moore acted negligently (1) in failing to discover the alleged intrauterine pregnancy and (2) in recommending and administering the me-thotrexate injection. The Moore defendants answered the complaint, denying the allegations.
 

 After the parties completed discovery, the cause was tried before a jury.
 
 [5]
 
 The trial court denied the Moore defendants’ motions for a judgment as a matter of law (“JML”) made at the close of Lawson’s case and at the close of all the evidence.
 

 The jury was unable to reach a verdict. The Moore defendants moved for a mistrial and again moved for a judgment as a matter of law. In a written order, the trial court granted the motion for a JML but did not explain in that order its basis for doing so. Lawson filed a motion to alter, amend, or vacate the judgment. The trial court held a hearing on that motion, and the motion was denied by operation of law under Rule 59.1, Ala. R. Civ. P. This appeal followed.
 

 Standard of Review
 

 The standard of review applicable to a ruling on a motion for a JML was stated in
 
 *420
 

 Mobile Infirmary Medical Center v. Hodgen,
 
 884 So.2d 801, 808-09 (Ala.2003):
 

 “Our standard of review for a renewed motion for a JML is well settled:
 

 “ ‘In reviewing the trial court’s ruling on a motion for a JML, an appellate court uses the same standard the trial court used in ruling on the motion initially. Thus, “ ‘we review the evidence in a light most favorable to the nonmovant, and we determine whether the party with the burden of proof has produced sufficient evidence to require a jury determination.’ ”
 
 Acceptance Ins. Co. v. Brown,
 
 832 So.2d 1, 12 (Ala.2001), quoting
 
 American Nat’l Fire Ins. Co. v. Hughes,
 
 624 So.2d 1362, 1366-67 (Ala.1993); see, also,
 
 Jim Walter Homes, Inc. v. Kendrick,
 
 810 So.2d 645, 649-50 (Ala.2001).’
 

 “Hicks v. Dunn,
 
 819 So.2d 22, 23-24 (Ala.2001). Thus, in reviewing the evidence in this case, we are required to construe the facts and any reasonable inferences that the jury could have drawn from them most favorably to [the nonmovant].”
 

 Additionally, this Court noted in
 
 Liberty National Life Insurance Co. v. Daugherty,
 
 840 So.2d 152, 156 (Ala.2002):
 

 “ ‘ “A judgment as a matter of law is proper only where there is a complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could differ and the moving party is entitled to a judgment as a matter of law.” ’
 
 Southern Energy Homes, Inc. v. Washington,
 
 774 So.2d 505, 510-11 (Ala.2000), quoting
 
 Locklear Dodge City, Inc. v. Kimbrell,
 
 703 So.2d 303, 304 (Ala.1997). In reviewing the denial of a motion for a judgment as a matter of law, this Court is required to view the evidence in a light most favorable to the nonmovant.
 
 Kmart Corp. v. Kyles,
 
 723 So.2d 572, 573 (Ala.1998). Therefore, where the evidence in the record is disputed, we present it in a light most favorable to [the nonmovant].”
 

 Discussion
 

 The sole issue in this appeal, as argued by the Moore defendants in their motion for a JML in the trial court and in their materials to this Court, is whether Lawson offered substantial evidence indicating that, when the methotrexate was administered, there was a viable intrauterine pregnancy. The Moore defendants contend:
 

 “Based on the nature of Ms. Lawson’s allegations, she could recover damages against [Dr. Moore] if, and only if, her intrauterine pregnancy was viable, i.e., if the pregnancy probably would have survived to term without Dr. Moore administering methotrexate. If Ms. Lawson’s intrauterine pregnancy was probably nonviable — and probably would not have survived to term regardless of Dr. Moore’s treatment — then there would be no basis for attributing Ms. Lawson’s alleged damages to Dr. Moore. Simply stated, if the intrauterine pregnancy probably would have failed regardless of Dr. Moore’s treatment, he cannot be found to have caused Ms. Lawson’s injury.”
 

 The Moore defendants cite the testimony of their expert, Dr. Richard Blackwell, who testified that, talcing into account the information Dr. Moore had at the time, Dr. Moore acted appropriately in administering the methotrexate on January 2, 2004, because, Dr. Blackwell asserted, Lawson’s pregnancy would have failed regardless of the administration of the methotrexate.
 
 [6]
 
 
 *421
 
 Additionally, the Moore defendants contend that the ultrasounds conducted on Lawson on January 1 and January 3, 2004, demonstrate that no viable intrauterine pregnancy was present. In support of that assertion, the Moore defendants cite Dr. Moore’s testimony at trial as well as the testimony of Dr. Berto Lopez, who testified as an expert on Lawson’s behalf.
 

 Lawson, however, contends that Dr. Lopez’s testimony at trial provided substantial evidence indicating that a viable intrauterine pregnancy existed and that, based on the information available to him on January 2, 2004, Dr. Moore acted negligently in recommending and administering methotrexate to Lawson. Specifically, Dr. Lopez testified as follows:
 

 “A. ...
 
 On the basis of the information Dr. Moore had on January 2, he had ultrasounds that showed ivhat you would expect a progression of a normal pregnancy. He had hormone numbers that showed a normal progression of a pregnancy. And that’s not the candidate that you give methotrexate to if you suspect an ectopic pregnancy or-other type of pregnancy other than a normal pregnancy.
 
 Because once you give it you can’t give it back. And the worse thing in the world is to administer something you can’t take back and the very next day you find out that it was in fact a pregnancy inside of the uterus.
 

 “That baby is now doomed to suffer the consequences of methotrexate.
 

 “Q. And that consequence is what?
 

 “A. Consequence is that baby will die and it is substandard in the presence of his knowledge that the beta HCG,[
 
 7
 
 ] the hormone numbers were rising.
 
 The serum progesterone indicated that this is a baby that was going to survive more likely than not.
 
 And that the ultrasounds were encouraging that there was something inside of the uterus that looked like a baby.
 

 “He should not have used methotre-xate. And I’m critical of his use of methotrexate knowing these facts in advance of his administration on the 2nd of January of 2004.
 

 “Q. Do you express that opinion to a medical — -to a reasonable degree of medical certainty?
 

 
 *422
 
 “A. Yes, to a reasonable degree of medical certainty it was inappropriate for Dr. Moore to have administered me-thotrexate to patient Lawson in light of the fact that I mentioned before.
 

 “Q. And is this your opinion that there is a cause and effect relationship between his breach of the standard of care and the ultimate fetus, demise of the fetus?
 

 “A. Yes. To a reasonable degree of medical certainty the reason this baby died is because of the administration of methotrexate.
 

 “Q. Do you still or do you maintain or advocate that opinion in light of what you know and what you have reviewed from Mrs. Lawson’s presentment at the emergency room and on December 27 and/or December 31, 2003?
 

 “A. Yes. Because again she has progression of her beta HCGs. Her ultrasounds showed progression of the things, the landmarks that you would expect in a normal pregnancy. And the possibility that this was a pregnancy inside of the uterus had to be respected above all else.
 

 “Now if he had concerns that it was an ectopic pregnancy, he had other options for treating an ectopic pregnancy. He could have taken her to the operating room and either cut her stomach open and looked around for an ectopic pregnancy or gone in through her belly button and looked for ectopic pregnancy. And those two things would not have harmed the pregnancy that was inside of her uterus. It would not have been, you know, something that could not be taken back, shall we say. In other words, it was not a course of action for which there was no recourse.
 

 “If you do surgery on a patient and they turn out not to have an ectopic pregnancy, most of the time the pregnancy progresses normally to whatever destiny it is going to have otherwise. So there were other options that were available to him with the information he had. The one he chose was the one that was probably the worse for the baby and certainly the one that you couldn’t take back. And that was a mistake.”
 

 (Emphasis added.)
 

 We agree with Lawson that Dr. Lopez’s testimony in that regard is substantial evidence indicating that a viable intrauterine pregnancy existed and that, based on the information available to him on January 2, 2004, Dr. Moore acted negligently in recommending and administering methotre-xate to Lawson.
 
 [8]
 

 At the hearing on Lawson’s postjudgment motion, the trial court stated “that there was absolutely no credible evidence, none, I mean, not a shred of credible evidence to support a finding for [Lawson]” and that “the overwhelming evidence, the substantial evidence, was for a defense verdict.” In ruling on a motion for a JML, however, a court is to determine whether there is substantial evidence to support each element of the nonmov-ant’s claim.
 
 Mobile Infirmary Med. Ctr.,
 
 884 So.2d at 808-09;
 
 Liberty Nat’l Life Ins. Co.,
 
 840 So.2d at 156. In this case,
 
 *423
 
 Lawson presented substantial evidence through Dr. Lopez’s testimony indicating that Dr. Moore acted negligently and that his alleged negligence terminated a viable intrauterine pregnancy. Although Dr. Lopez’s testimony in that regard is in conflict with Dr. Moore’s testimony and the testimony of the Moore defendants’ expert, Dr. Blackwell, “[a] motion for a judgment as a matter of law ‘is properly denied where there exists any conflict in the evidence for consideration by the jury.’ ”
 
 Williams v. BIC Corp.,
 
 771 So.2d 441, 446 (Ala.2000) (quoting
 
 Cloverleaf Plaza, Inc. v. Cooper & Co.,
 
 565 So.2d 1147, 1149 (Ala.1990)).
 
 See also Liberty Nat’l Life Ins. Co.,
 
 840 So.2d at 156 (“ ‘ “A judgment as a matter of law is proper only where there is a complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could differ and the moving party is entitled to a judgment as a matter of law.” ’ ” (quoting
 
 Southern Energy Homes, Inc. v. Washington,
 
 774 So.2d 505, 510-11 (Ala.2000), quoting in turn
 
 Locklear Dodge City, Inc. v. Kimbrell,
 
 703 So.2d 303, 304 (Ala.1997))). Consequently, the trial court erred in granting the Moore defendants’ motion for a JML.
 

 Conclusion
 

 The judgment is reversed, and the cause is remanded.
 

 REVERSED AND REMANDED.
 

 SEE, WOODALL, BOLIN, and PARKER, JJ., concur.
 

 COBB, C.J., recuses herself.
 

 [1]
 

 . According to Dr. Moore’s brief,
 

 "[in] an ectopic pregnancy, the developing embryo does not implant on the endometrial wall, but instead attaches to some other surface. Ectopic pregnancy allows the con-ceptas to implant and mature outside the endometrial cavity, which ultimately ends in death of the fetus. Without timely diagnosis and treatment, ectopic pregnancy can become a life-threatening situation. Ectopic pregnancy currently is the leading cause of pregnancy-related death during the first trimester in the United States.”
 

 [2]
 

 . Dr. Moore's brief states: “Pseudo gestational sacs are created as a result of hormones excreted by the body in response to the developing ectopic pregnancy. These sacs typically develop in the central aspect of the endometrial cavity, as opposed to being buried within the uterine wall as common with healthy or viable gestational sacs.”
 

 [3]
 

 . According to Dr. Moore’s brief, "[m]ethotre-xate is an antimetabolite drug used for treatment of ectopic pregnancies. Methotrexate causes ectopic pregnancies to degenerate without having to utilize surgical methods of removal.”
 

 [4]
 

 . Dr. Moore testified that Lawson informed him that she had undergone a number of specific surgical procedures. He testified further that Lawson, in deciding to be treated by the use of methotrexate, told him she "did not want to have another surgery.”
 

 [5]
 

 . The Moore defendants did not move for a summary judgment before the case was tried.
 

 [6]
 

 . Dr. Blackwell testified specifically as follows:
 

 
 *421
 

 "Q.
 
 All right, sir. Now with regard to the ultrasound on January 1, do you have an opinion as to whether that ultrasound demonstrated a normal, healthy, viable fetus, a fetus that had opportunity to be born?
 

 “A. I don't believe this was a viable pregnancy. No matter how you dated the pregnancy, you basically didn’t see any of the markers that should have been seen.
 

 [[Image here]]
 

 "Q. ... Based on what you see on the ultrasound report for January 1, what is your opinion with regard to whether— whatever was defined had any opportunity to develop into a live healthy baby?
 

 "A. I don’t think this would have resulted in a live birth.
 

 "Q. What in your judgment would have occurred in time?
 

 ’’A. If you simply left it alone long enough, you would have had an ultimate miscarriage hopefully without having some of the complications that can occur from a retained pregnancy.
 

 [[Image here]]
 

 "Q. ... In your judgment, did Dr. Moore provide appropriate and good care to this patient?
 

 “A. Yes, he did.
 

 "Q. Did he do anything to destroy an opportunity for an intrauterine pregnancy to develop?
 

 “A. Absolutely not. And I think probably helped preserve her fertility.
 

 "Q. And did he also potentially save her life by treating the ectopic pregnancy?
 

 “A. Yes, sir.”
 

 [7]
 

 . "The hormone human chorionic gonadotro-pin (better known as hCG) is produced during pregnancy and can be used to determine the viability of pregnancy.” Dr. Moore's brief, p. 18 n. 6.
 

 [8]
 

 . Dr. Lopez also testified that ultrasounds performed after January 2, 2004, confirmed that Lawson had a viable intrauterine pregnancy. Specifically, Dr. Lopez testified that one of the ultrasounds showed the fetus as having a heartbeat of 88 beats per minute, which he testified was “slower than normal” but consistent with what he would expect given that “this baby [had] been exposed to [a] lethal dose of methotrexate.” Dr. Moore testified, however, that die normal heartbeat range for a fetus in the first trimester is between 120 and 160 beats per minute and that such a fetus, if viable, could not have a heartbeat rate of 88 beats per minute.